ATLANTIC RICHFIELD COMPANY, Plaintiff,

v.

Walter J. HICKEL, Secretary of the Interior, and J. R. Schwabrow, Regional Oil and Gas Supervisor, United States Geological Survey, Casper, Wyoming, Defendants.

Civ. No. 5277.

United States District Court
D. Wyoming.

Aug. 22, 1969.

McClintock, Mai & Urbigkit, Cheyenne, Wyo., Rex Short, Tulsa, Okl., Charles A. Redpath, Jr., Denver, Colo., Chapman, DiSalle & Friedman, Washington, D. C., and Akolt, Shepherd & Dick, Denver, Colo., for plaintiff.

Richard V. Thomas, U. S. Atty. for District of Wyoming, and Thomas L. McKevitt, Atty., Dept. of Justice, Washington, D. C., for defendants.

## Memorandum

KERR, District Judge..

This is an appeal by Atlantic Richfield Company from a decision by the Solicitor, acting for and in behalf of the Secretary of Interior, sustaining the action of the Regional Oil and Gas Supervisor in demanding that the plaintiff pay to the United States the sum of $3,209,763.30, being the amount of underpaid royalty since 1948 on two public oil and gas leases. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 (action arising under the Act of August 8, 1946, 30 U.S.C. § 226c); 28 U.S.C. §§ 2201, 2202 (Declaratory Judgment); and under 5 U.S.C. §§ 702–706, being part of the Administrative Procedure Act. The case is before the Court on the motions of both parties for summary judgment. The issue to be determined is whether oil production from the Madison and Cambrian formations in the Lost Soldier Field, Sweetwater County, Wyoming, is such production which qualifies for the royalty reduction provisions of Section 12 of the Act of August 8, 1946, 30 U.S.C. §

226c. Section 12 of the Act reads as follows:

"From and after August 8, 1946, the royalty obligation to the United States under all leases requiring payment of royalty in excess of 12½ per centum, *except leases issued* or to be issued upon competitive bidding, is reduced to 12½ per centum in amount of value or production removed or sold from said leases as to (1) such leases, or such part of the lands subject thereto, and the deposits underlying the same, *as are not believed to be within the productive limits of any oil or gas deposit*, as such productive limits are found by the Secretary to exist on August 8, 1946, and (2) *any production on a lease from an oil or gas deposit which was discovered after May 27, 1941, by a well or wells drilled within the boundaries of the lease, and which is determined by the Secretary to be a new deposit*; and (3) any production on or allocated to a lease pursuant to an approved unit or cooperative agreement from an oil or gas deposit which was discovered after May 27, 1941, on land committed to such agreement, and which is determined by the Secretary to be a new deposit, where such lease was included in such agreement at the time of discovery, or was included in a duly executed and filed application for the approval of such agreement at the time of discovery." (Emphasis added)

This is the section of the Act the Secretary interpreted in his decision and which is now under review by this Court. Atlantic Richfield challenges the Secretary's interpretation of clause (1), and it is this clause with which the Court is primarily concerned.

The material facts, none of which are in dispute, are as follows: The leases in question, Cheyenne 029630(a) and Cheyenne 065546 were issued on a noncompetitive basis by the United States, as lessor, to the Lost Soldier Development Company and certain individuals on January 1, 1940, and later assigned to Sinclair on October 29, 1942. The lands

embraced by the two leases are in an area commonly referred to as the Lost Soldier Field located in Sweetwater County, Wyoming. Each lease contained a so-called step-scale royalty provision whereby the royalties due increased from 12½% to a maximum of 32% as production increased. Production was obtained on both leases from the Tensleep formation and shallower formations prior to August 8, 1946, and royalty payments with respect to that production were and are being paid under the step-scale provisions of the leases. On December 24, 1942, the O'Mahoney Act, 56 Stat. 1080, was passed, encouraging discovery efforts of lessees drilling on their own leaseholds. On August 8, 1946, Congress enacted certain major amendments to the Mineral Leasing Act of 1920. Section 12 of the Act, cited above, was passed on this date. On January 4, 1948, Sinclair discovered the Madison formation, a formation underlying the Tensleep formation by drilling on adjoining privately owned land. By letters dated January 16, 1948, from Sinclair to the Director, Geological Survey, a request was made for a determination with respect to leases Cheyenne 029630 (a) and Cheyenne 065546 that the lands in those leases "are outside and not within the productive limits of any producing oil or gas deposit lying below the base of the Tensleep formation, as such productive limits were known to exist on August 8, 1946, as authorized by Section 12 of the Act of Congress approved August 8, 1946". Letters dated January 28, 1948, from the Acting Director, Geological Survey, to Sinclair stated that the leased lands were not within the productive limits of any producing oil or gas deposit lying below the base of the Tensleep formation as those limits were known to exist on August 8, 1946. The first well to the Madison formation on lease Cheyenne 065546 was completed on March 19, 1948. On June 1, 1948, a letter was sent from Sinclair to the U. S. Geological Survey with respect to production from the Madison formation on lease Cheyenne 065546 and transmittal of division order showing 12½% royalty to the United States. Following this letter a reply letter from the Supervisor, Geological Survey, was sent to Sinclair on June 9, 1948, approving the division order on the Madison formation with respect to lease Cheyenne 065546 with the caveat that "nothing herein shall be construed as affecting any of the relations between the lessee and the Secretary of the Interior". The first well to the Madison formation on lease Cheyenne 029630(a) was not completed until August 1948, and on August 18, 1948, a letter similar to the letter of June 1, 1948, was sent by Sinclair to the U. S. Geological Survey. On August 23, 1948, a similar letter to the one of June 9, 1948, was sent to Sinclair from the Supervisor, Geological Survey. On June 26, 1948, discovery of the Cambrian formation, a formation underlying both the Tensleep and Madison formations, was made by Sinclair by drilling on privately owned leased land. The first wells to the Cambrian formation on lease Cheyenne 029630(a) and lease Cheyenne 065546 were completed by Sinclair in September 1949 and May 1950, respectively. On May 17, 1950, a transmittal of division order was sent to the U. S. Geological Survey showing 12½% royalty to the United States on the Cambrian production from lease Cheyenne 029630(a), and on June 13, 1950, a similar transmittal of division order was sent relating to production from the Cambrian formation on lease Cheyenne 065546. Royalty payments pertaining to the Madison and Cambrian formations were made and accepted at 12½% until November 22, 1961. On that date, a letter was sent to Sinclair by J. R. Schwabrow, Regional Oil and Gas Supervisor, demanding payment of back royalties due in the sum of $3,209,763.30 from the period April 1, 1948, to September 30, 1961. On December 12, 1961, Sinclair appealed the demand for additional royalties to the Director of the Geological Survey. The Acting Director entered a decision on July 29, 1966, sustaining the Supervisor's demand for additional royalties. Sinclair Oil and Gas Co., GS-37-O&G. On September 7, 1966, Sinclair appealed

to the Secretary of the Interior. The Solicitor, acting for and in behalf of the Secretary, affirmed the decision rendered by the Acting Director on June 20, 1968. Sinclair Oil and Gas Co, A-30709, 75 I.D. 155 (1968). On August 14, 1968, Sinclair's petition for the exercise of supervisory authority was also denied by the Solicitor, acting for and in behalf of the Secretary. On September 12, 1968, this action was instituted by Sinclair, now known as Atlantic Richfield Company.

With the material facts of the case not in dispute, the controverted issue remains as to the proper interpretation of item (1) of Section 12 of the Act pertaining to the amount of royalty due from the two leases in question. The plaintiff's main contention is that the Secretary's interpretation of the statute is erroneous and inconsistent with the legislative purpose behind the Act.

When Congress has committed to an administrative agency a wide area of discretion necessarily calling for expert judgment, judicial review of that judgment is a limited one. First Citizens Bank and Trust Company v. Camp, (D.C.N.C.1968), 281 F.Supp. 786. The Secretary of the Interior in carrying out his functions in the administration and management of public lands has a wide range of discretion, and administrative action taken by him will not be disturbed by the Court unless clearly wrong. Safarik v. Udall, 113 U.S.App. D.C. 68, 304 F.2d 944 (1962), cert. den., Hansen v. Udall, 371 U.S. 901, 83 S.Ct. 206, 9 L.Ed.2d 164. The Secretary's interpretation of the Act of August 8, 1946, is entitled to great weight by the Court upon review. See Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed. 2d 616 (1965). In Udall v. Tallman, the Court stated, "when faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration". The Secretary's interpretation of the Act should not be disturbed unless the Court finds it to be so clearly erroneous as to be arbitrary and capricious. See Atewooftakewa v. Udall, (D.C.W.D.Okla. 1967) 277 F.Supp. 464.

In considering the basic statutory construction issue, the Secretary concluded that where a portion of the land in an oil and gas lease lies within the horizontal limits of an oil or gas deposit which was known to be productive on August 8, 1946, the lessee is not entitled under item (1), of Section 12, of the Act of August 8, 1946, to a flat royalty rate of 12½ percent on production later obtained from deeper zones underlying the same horizontal limits, which deeper zones were discovered by wells drilled outside the lease boundaries subsequent to August 8, 1946.

Atlantic Richfield attacks as erroneous the addition of the word "horizontal" in describing the phrase, "productive limits". They argue that the legislative history of the Act indicates that Section 12 was enacted to encourage the discovery of oil and gas on the public domain during the period of national emergency brought on by World War II and because of this, reduced royalty rates were established to provide the incentive to discover and develop new deposits. They argue, therefore, that construing the phrase, "productive limits" to mean "horizontal productive limits" destroys the incentive to search for oil and gas in deeper strata and this is inconsistent with the legislative purpose behind the Act. Atlantic Richfield contends that the Madison and Cambrian formations are situated stratigraphically below the base of the Tensleep formation, and as such, were not believed to be within the productive limits of any oil or gas deposit as of the effective date of the Act. In other words, they argue that the Madison and Cambrian formations were separate and distinct deposits from the Tensleep formation and were discovered by exploratory wells as opposed to development, or non-exploratory wells.

Up to the present time there has been no judicial interpretation of Section 12

of the Act of August 8, 1946. The decision handed down by the Secretary of the Interior in Richfield Oil Corporation, 62 I.D. 269 (1955), provided the basis for the decision of the Secretary in this case. The *Richfield,* decision established the Department of the Interior's interpretation of Section 12 of the Act. Atlantic Richfield's present action is, in essence, an attempt to overturn the Department's decision in *Richfield Oil Corporation,* supra.

The essential point made by the Secretary with respect to the legislative history was that the Act represented a compromise between conflicting views; that Congress cannot be presumed to have adopted the entire position of the oil industry; that Congress used language in this particular section of the Act which necessarily points to the Secretary's interpretation and that the Secretary's interpretation was consistent with the exclusion of competitive leases from the provisions of the Act. The crucial factor to be taken into account is the difference between competitive leases issued by the government and non-competitive leases. The determining factor was whether a particular lease in question embraced lands which were within a known geological structure. Once a lease is known to be on a known geological structure it may be said to be in proven territory and there is no need to hold out incentives for further exploration. Further development with respect to these lands would undoubtedly prove less hazardous than with lands which were not within a known geological structure. The purchaser of a competitive lease paid a premium in the form of a higher bid in order to obtain a lease covering a known geological structure. Noncompetitive leases, on the other hand, were issued by the government on lands not known to be within a known geological structure. Discovery and development of oil and gas on these lands would be far more hazardous than on lands embraced within a known geological structure. One holding a lease on lands not within a structure could well be said to require some additional incentive to encourage drilling operations. This, then, provides the explanation for the enactment of Section 12 of the Act which provided for royalty reduction as an incentive for discovery and development. The United States government was concerned about the petroleum shortage created by World War II and sought to increase incentive for the discovery and development of new oil and gas deposits which were not within a known geological structure. This assumingly explains the elimination by Congress of competitive leases from Section 12 of the Act.

While it is true that the two leases in question were originally issued on a non-competitive basis, it should be noted that a non-competitive lease which was either producing on the date of the Act or known to overlay *any* deposit producing off the lease was, in effect, in the same position as a competitive lease in that both were within a known geological structure. In his decision in this case, the Secretary relied heavily on the *Richfield* decision, supra.

In the *Richfield* decision the Secretary stated as follows:

"* * * If the land involved in this appeal * * * had not been leased on August 8, 1946, and was thereafter leased, it would have had to be leased by competitive bidding because of its situation within the known geologic structure of the Wheeler Ridge field, and the lease would have carried the graduated royalty scale prescribed for competitive leases. The graduated rates would apply not only to production from the Old upper and Old lower zones but also to production from the three zones involved in this appeal. This would be true of any lease issued after August 8, 1946, for land which is believed to be within the horizontal productive limits of an oil or gas deposit as they are found to exist on August 8, 1946. Such lease would necessarily have to be issued by competitive bidding as the inclusion of the land within the productive limits of an oil or

gas deposit would automatically place the land within the known geologic structure of a producing field * * "

This, I believe, is an accurate statement of the situation presented by this case. The leases involved in this case, although non-competitive when issued, were, on August 8, 1946, actually producing. In other words, in addition to being within the geologic structure of a producing oil or gas well, they actually contained a known producing deposit. The lands covered by these leases and the lands subject thereto, were within a proven territory. To say that added incentive was necessary to encourage the development of this territory would frustrate the legislative purpose behind the Act. Congress did not contemplate that added incentive would be required for development of a proven area such as this. Congress was concerned with the exploration and development of new deposits, "not believed to be within the productive limits of any oil or gas deposit". The essence of the Secretary's conclusion based on the literal language of the Act, that as long as a lease or the lands subject thereto was producing on August 8, 1946, it obviously could not be "not believed to be within the productive limits of any oil or gas deposit on that date," stands as unassailable logic supporting the Secretary's interpretation.

The Act, itself, specifically refers to "such part of the lands subject thereto", and the Secretary following the Departmental interpretation in the *Richfield* decision, supra, held that the phrase, "part of the lands", is normally interpreted as meaning a horizontal rather than a vertical separation. I cannot conclude that this interpretation is so wholly erroneous as to be arbitrary and capricious. The Secretary is given wide discretion in arriving at administrative decisions, and it cannot be said that such an interpretation is an abuse of this discretion.

Construing the phrase "productive limits" to mean "horizontal productive limits" would bring the Madison and Cambrian formations underlying the two leases in question within the productive limits of the Tensleep formation, and thus disqualify such production from the royalty reduction provisions of clause (1) of Section 12 of the Act. As the Secretary found, this production was not eligible for the 12½% royalty, but should have been included under the step-scale provisions of the original leases.

It should be noted at this point that the Acting Director, Geological Survey, by his letters of January 28, 1948, to Sinclair, did not legally bind the United States contractually with respect to the plaintiff's royalty obligation. The Geological Survey made only a geological determination, not a legal or contractual determination. No determination was made by the Geological Survey in 1948 that Sinclair was entitled to a flat royalty rate of 12½%. Also, the approval of the division orders sent by Sinclair to the Supervisor, Geological Survey, was a qualified one. That approval was given "subject to the condition that nothing herein shall be construed as affecting any of the relations between the lessee and the Secretary of the Interior".

Upon review of the entire decision rendered by the Solicitor, for and in behalf of the Secretary, I find that the Secretary thoroughly considered the legislative history behind the Act; properly interpreted the purpose of the Act; and reasonably construed the provisions of the Act in accordance with the overall legislative purpose in the enactment of the Act of August 8, 1946. Upon this basis, I conclude that the Secretary acted reasonably within the bounds of his discretion in finding that the phrase "productive limits" should be construed as "horizontal productive limits". This interpretation was not clearly erroneous and did not arbitrarily include the Madison and Cambrian formations within the productive limits of the Tensleep formation. This is a reasonable interpretation in light of all the facts and surrounding circumstances and is in accordance with the legislative purpose of the Act of August 8, 1946.

Having held that the Secretary was correct in his interpretation of the Act, it is unnecessary to dispose of the question of estoppel. Accordingly, the defendants' motion for summary judgment will be sustained, and the plaintiff's motion for summary judgment will be denied.