ARKLA EXPLORATION COMPANY and
State of Arkansas, Plaintiffs,

v.

James G. WATT, Secretary of the United
States Department of the Interior, and
Texas Oil and Gas Corp., Defendants.

Civ. No. 82–2168.

United States District Court,
W.D. Arkansas,
Fort Smith Division.

April 19, 1983.

Jim Guy Tucker, Mitchell, Williams &
Selig, Little Rock, Ark., Alan S. Novins, Lee
Ellen Helfrich, Lobel, Novins & Lamont,
Washington, D.C., Robert Roberts, III,
Blanchard, Walker, O'Quin & Roberts,
Shreveport, La., for plaintiff, Arkla Explo-
ration Co.

Steve Clark, Atty. Gen., and Roger W.
Giles, Asst. Attys. Gen., Little Rock, Ark.,
for plaintiff-intervenor, State of Ark.

W. Asa Hutchinson, U.S. Atty., Fort
Smith, Ark., Andrew F. Walch, Patricia J.
Beneke, Land and Natural Resources Div.,
Mark K. Seifert, Energy and Resources
Div., Office of the Solicitor, Dept. of the
Interior, Washington, D.C., for defendant,
James G. Watt.

Bradley D. Jesson, Robert T. Dawson,
Hardin, Jesson & Dawson, Fort Smith,
Ark., Craig R. Carver, Gibson, Dunn &
Crutcher, Denver, Colo., for defendant,
Texas Oil and Gas Corp.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

H. FRANKLIN WATERS, Chief Judge.

*Introduction*

The historical background and factual
summary of this action is set forth in the
Court's Memorandum Opinion of September
20, 1982, ruling on certain preliminary mo-
tions. *Arkla Exploration Co. v. Watt,* 548
F.Supp. 466 (W.D.Ark.1982), at 468–469.
For purposes of brevity, the same will not
be reiterated herein.

Hearing on motion for preliminary in-
junction and trial on the merits was held in
Fort Smith from September 27, 1982,
through September 30, 1982. At the close
of the trial, the Court entered a preliminary
injunction restraining the Secretary of the
Interior from reinstating certain leases is-
sued noncompetitively to Texas Oil and Gas
Corp. (TXO), and restraining TXO from
further drilling activities on the lands in
question. At the conclusion of the trial, the
Court directed the parties to submit simul-
taneous briefs and proposed findings and
conclusions.

Ten witnesses were produced at trial.
For the plaintiffs were:

1. W.E. "Bill" Wright—Director, Arkan-
   sas Oil & Gas Commission;

2. Boyd Haley—Geologist, U.S. Geologi-
   cal Survey;

3. Norman F. Williams, Sr.—State Geologist, State of Arkansas;

4. Cliff C. Burgess—Vice President, Land Department, Arkla Exploration Company;

5. James C. Black—Vice President, Geological and Geophysical Department, Arkla Exploration Company;

6. Charles S. Bartlett, Jr.—Consulting Geologist;

7. Emmett A. Finley—Former Chief, Branch of Mineral Classification, U.S. Geological Survey.

Testifying for defendants were:

1. Doy Zachry—Associate Professor, Department of Geology, University of Arkansas;

2. Gary Horton—Acting Chief, Division of On-Shore Resource Evaluation, Mineral Management Service;

3. Dale Zimmerman—Assistant to the Deputy Director for Energy and Mineral Resources, Bureau of Land Management.

The Court accepted three deposition transcripts, subject to later ruling on objections to portions of the transcripts. These were the depositions (Tr. 131–137) of:

1. Joseph R. Binford—Senior Attorney, TXO;

2. Jeff O. Holdren—Chief, Division of Lands and Minerals Operations, Eastern States Office, Bureau of Land Management;

3. Edward L. Johnson—former Area Geologist, Tulsa, U.S. Geological Survey.

From the evidence adduced at trial, the Court hereby enters the following findings of fact and conclusions of law.

### Findings of Fact

1. Fort Chaffee Military Reservation, within which the lands in question are located, lies primarily in the northeast corner of Sebastian County, although portions of both the Fort and the lands extend into western Franklin County (Ex. 26), Arkansas.

2. Geologically, the Fort is within what is known as the Arkoma Basin, which extends from west Texas through Oklahoma to east Arkansas.

3. The Fort lies north of the Ouachita Mountains which are composed of many highly deformed sedimentary rocks (Zachry, Tr. 547), and south of the Ozark Plateau. (Zachry, Tr. 548)

4. The "lands in question" are those sought to be leased by TXO, and comprise 33,510.4 acres within Fort Chaffee. (Ad. Rec. 15–34)

5. In 1920, Congress enacted the Mineral Leasing Act, 41 Stat. 437, as amended, 30 U.S.C. 181 et seq., giving the Secretary discretionary authority to open public domain lands to mineral exploration and development.

6. From 1920 to 1947, the authority of the Secretary of the Interior to lease mineral rights on federal lands was limited under the Mineral Leasing Act to "public domain lands," that is, land claimed by the United States as part of its national sovereignty. 41 Stat. 437, as amended, 30 U.S.C. 181 et seq.

7. In 1947, Congress authorized leasing on "acquired lands," lands acquired by the Federal Government from private owners for public purposes. Mineral Leasing Act for Acquired Lands, 61 Stat. 913, 30 U.S.C. 351 et seq. Fort Chaffee fits within this category. However, that Act specifically excluded military lands from leasing.

8. In 1976, Congress amended the Mineral Leasing Act for Acquired Lands and removed the military lands exclusion, thereby opening up such lands for leasing. Federal Coal Leasing Amendments Act of 1975, § 12, Pub.L. No. 94–377, 90 Stat. 1083 (Tr. 766).

9. Under the Mineral Leasing Act of 1920, oil and gas leasing is divided into two categories: competitive and non-competitive. That Act provides that only lands within a "known geological structure of a producing oil and gas field" may be leased to the highest qualified competitive bidder, 30 U.S.C. 226(b). Otherwise, lands not

within a "known geological structure" (KGS), if leased at all, may be leased only to the first qualified applicant on a non-competitive basis. 30 U.S.C. 226(c). (Tr. 761)

10. In May, 1977, some nine months after enactment of the Federal Coal Leasing Amendments Act of 1975, Texas Oil and Gas Corp. (TXO) filed applications for 38 non-competitive oil and gas leases covering 78,000 acres on Fort Chaffee.

11. Neither Arkla nor the Secretary of the Interior was aware that the Federal Coal Leasing Amendments Act of 1975 had the effect of opening Fort Chaffee to mineral leasing without the necessity of notice published in the Federal Register. This issue of first impression was decided in *TXO v. Watt,* 683 F.2d 427 (D.C.Cir.1982).

12. In September, 1977, the Department of the Interior published draft regulations implementing the changes brought about by the Federal Coal Leasing Amendments Act of 1975. 42 Fed.Reg. 46,558–46,559 (Sept. 16, 1977). These regulations became effective in September, 1978. 43 Fed.Reg. 37,202.

13. Eighteen of TXO's applications covering 45,000 acres were either rejected or withdrawn by the company because either (1) the Army would not permit leasing, (2) the United States did not hold the mineral rights in the area, or (3) the areas were within a known geologic structure (KGS), making them available only for competitive leasing.

14. Twenty of TXO's offers to lease lands at Fort Chaffee were accepted by the Bureau of Land Management (BLM) and leases were issued effective July 1, 1979, covering approximately 33,000 acres. The total lease payments received were $33,-000.00.

15. Arkla filed a protest on September 17, 1979, with the Eastern States Office, BLM, against the issuance of the TXO leases (Arkla Amended Complaint, p. 2).

16. The Secretary of the Interior concluded that the Fort Chaffee leases, having been issued on applications submitted prior to the effective date of the new regulations implementing changes brought about by the Federal Coal Leasing Amendments Act of 1975 should not have been issued. On November 1, 1979, he issued a decision cancelling the leases and rejecting all pending applications for leases on military lands which had been filed prior to September 21, 1978, the effective date of the new regulations. *See, e.g.,* Ad.Rec. 15. TXO sued to have the leases reinstated.

17. The district court upheld the Secretary's action. *Texas Oil & Gas Corp. v. Andrus,* 498 F.Supp. 668 (D.D.C.1980).

18. The administrative protest filed by Arkla was dismissed as moot on January 3, 1980, and no appeal to the Interior Board of Land Appeals was taken.

19. On August 4, 1982, plaintiff Arkla filed its complaint, seeking an order directing the Secretary of the Interior not to issue twenty (20) oil and gas leases to TXO on Fort Chaffee, Arkansas.

20. Plaintiff Arkla's complaint raises the following claims: (1) that the Department of the Interior (DOI) was arbitrary and capricious in promulgating the current definition of a "known geological structure of a producing oil or gas field" (KGS) found at 43 C.F.R. 3100.0–5(a); (2) that the KGS determination made in this instance was arbitrary and capricious; (3) that defendant violated the Administrative Procedure Act (APA) in not publishing a notice in the Federal Register that the Fort Chaffee lands were available for leasing; (4) that defendant violated plaintiff's due process rights; and (5) that defendant violated Sections 302(b) and 303(c)(1) of the Department of Energy Organization Act, 42 U.S.C. §§ 7152(b), 7153(c) (Pub.L. No. 95–91, August 4, 1977).

21. Plaintiff Arkla sought a temporary restraining order, which was granted by order of August 5, 1982.

22. In addition to opposing plaintiff's motion for preliminary injunction, both the federal defendant and TXO filed motions to dismiss. Federal defendant raised several bases for dismissal, including that: (1)

plaintiff lacks standing to pursue its action; (2) this Court lacks subject matter jurisdiction over the action; (3) Congress did not create a private cause of action under the Mineral Leasing Act of 1920; (4) the action is barred by the ninety-day statute of limitations in the Mineral Leasing Act of 1920; (5) Arkla failed to avail itself of administrative remedies and hence is barred from pursuing its action here; (6) the action is barred by collateral estoppel; and (7) Arkla's claims are without merit. In the alternative, defendants moved for a change of venue to the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1404(a).

23. Defendants' motions for a change of venue were denied by the Court from the bench.

24. By order of September 20, 1982, the Court denied defendants' motions to dismiss. The order was accompanied by a memorandum opinion. *Arkla Exploration Co. v. Watt,* 548 F.Supp. 466 (W.D.Ark. 1982).

25. The State of Arkansas moved to intervene as a plaintiff. The State raised essentially identical claims to those raised by Arkla, with the addition of one claim pertaining to the title to the mineral rights involved. This claim has been bifurcated from the remaining claims. Several local school districts also moved to intervene. In its September 20, 1982, order, the Court granted the State's motion, while denying those of the school districts.

26. Defendants filed motions to limit review in this case to the administrative record filed with the Court. Such motions were opposed by plaintiff. The Court granted defendants' motions to limit review to the administrative record with certain exceptions delineated in *Arkla Exploration Co. v. Watt, supra,* at 477–78.

27. On September 23, 1982, federal defendant moved for summary judgment in this matter on the bases that the scope of review is properly limited to the administrative record before the Court, there exist no genuine issues of material fact, and federal defendant is entitled to a judgment as a matter of law.

28. On September 27, 1982, the Court denied federal defendant's motion for summary judgment from the bench. (Tr. 3)

29. The Court conducted a consolidated hearing on the preliminary injunction and on the merits from September 27, 1982, through September 30, 1982.

30. At the conclusion of that hearing, the Court entered a preliminary injunction against the issuance of the subject leases by DOI.

31. Plaintiff Arkla is a corporation organized under the laws of the State of Delaware, with its principal place of business in Shreveport, Louisiana. Plaintiff is a wholly-owned subsidiary of the Arkansas Louisiana Gas Company, and is engaged in the business, *inter alia,* of exploring for, developing and producing oil and natural gas.

32. Plaintiff-intervenor is the State of Arkansas, and is represented by the State's Attorney General, Steve Clark.

33. Defendant James G. Watt is the Secretary of the Interior of the United States of America and is sued herein in his official capacity for actions taken by himself, under his responsibility and jurisdiction, and by his predecessor in office in his official capacity.

34. Defendant TXO is a corporation organized under the laws of the State of Delaware with a principal place of business in Dallas, Texas, and does business in the Western District of the State of Arkansas.

35. Plaintiffs have standing to pursue this action. The Court has subject matter jurisdiction. Plaintiffs have exhausted their administrative remedies. Venue is proper in this Court.

36. It is the policy and intent of Congress and the Department of the Interior to stimulate exploration of lands in which current exploratory interest is lacking and to promote competition with respect to lands in which the exploration interest and development is present.

37. The Fort Chaffee area is located in the Arkoma Basin, which extends from east-southeastern Oklahoma into west-central Arkansas. Ad.Rec. 39. Most of the natural gas in the area is in rocks of Pennsylvania age, known as the Atoka. (Tr. 550) Ad.Rec. 45.

38. Traps from which gas may be produced can be "structural," resulting from the presence of structure such as anticlines and synclines; "stratigraphic," resulting from configurations of the sediments; or can be "fault traps," resulting from the presence of faults. (Tr. 638–640, 561, 565–566)

39. All or substantially all of the lands in question are on the Biswell Hill Anticline, the Washburn Anticline, or the Game Hill Anticline. (Ex. 34; Tr. 377–378)

40. An anticline is a geologic structure consisting of an upward fold in a layer or layers of rock. (Tr. 559)

41. The Fort lies north of the Ouachita Mountains which are composed of many highly deformed sedimentary rocks (Zachry, Tr. 547), and south of the Ozark Plateau. (Zachry, Tr. 548).

42. The general location of the anticlinal and synclinal axes in the area of Fort Chaffee is shown on Plaintiff's Exhibit 34 and Defendant's Exhibit C.

43. Mr. Williams defined the extent of an anticline as being from "the axis of the anticline down to the axis of the syncline" (Tr. 101), or by measuring from syncline to syncline. In the case of Biswell Hill, Mr. Williams stated it would extend from the axis of the Greenwood syncline on the south to the axis of the Central syncline on the north.

44. As Dr. Bartlett and Mr. Finley and Dr. Zachry pointed out, gas, unless blocked by porosity, permeability, fault or leakage will always tend to migrate up structure. (Tr. 357, 462, 562, 597, 826) The fact a producing well is drilled in a syncline may indicate the producing layer may run from and be filled with gas from the syncline to the top of the anticline. (Tr. 834, 835)

45. Since gas will move upwards, if not impeded, whether it begins from the bottom of the syncline or halfway up the anticline, the Court finds that for KGS purposes, the anticlines should be measured from axis of syncline to axis of syncline.

46. The Atoka consists of alternating layers of sandstone and shale. (Tr. 550, 553) Ad.Rec. 44 at 69. There is production from many of the sandstones within the Atoka. Ad.Rec. 41. These sands are lenticular, or lens-shaped. (Tr. 111, 320, 561) They vary in character.

47. The geology of the Fort Chaffee area is complicated by faulting, folds and varied sand deposition. (Tr. 323) Faulting is present throughout the Fort Chaffee area. Ad.Rec. 39, 44, 46. (Tr. 551) Displacement from faults in this area ranges from less than 1,500 feet to 2,500 feet. Ad.Rec. 46 at 1.

48. A fault can divide one trap into two traps, since gas cannot migrate across the fault. (Tr. 115, 125, 305, 391, 428, 565–566)

49. The lands in question were at June 29, 1979, and are virtually surrounded by producing gas wells and there is a very high probability many gas discoveries will be made on those lands. (Report of O.W. Girard, Ad.Rec. 13a, p. 17; Ex. 7)

50. The region of the Fort Chaffee military reservation is characterized by extensive natural gas production. The earliest commercial gas well production in this region was in the early 1930's. (Ex. 26, e.g., Sec. 13, T8N, 29W) The earliest commercial gas well production within the boundaries of the Fort occurred in 1967 in Sec. 23, T8N, 31W. (Ex. 26)

51. Experts on behalf of all parties to this litigation have commented on the very high success ratio for exploration efforts in this region and their opinions of the future probability of production from the lands in question.

52. Dr. Zachry, a witness for TXO, described the success ratio within the Fort as "fairly high" for the Arkoma Basin overall and as "great" for six particular wells within the Fort. (Tr. 602, 614) Mr. Williams

described the success rate in the area as about 50%. (Tr. 126) He observed that his estimates were conservative and that the success ratio to date immediately around the Fort was higher than the success ratio in the Arkoma Basin generally. (Tr. 105) Mr. Horton described the lands as containing a large number of multiple, overlapping, productive zones (Tr. 700), and multiple, overlapping reservoirs. (Tr. 701)

53. Dr. Bartlett described the lands in question as "presumptively productive." (Tr. 394, 439, 429) He observed that a well drilled in the center of the Biswell Hill Anticline would have "going for it the fact that there are within a couple of miles of that location . . . seven different producing sands" and that the "odds are excellent that that well will drill into one or the other of those" sands. (Tr. 396) He also reported that there are zones of production at least three miles wide in an East-West direction. (Tr. 832)

54. At June 29, 1979, the date on which Mr. Johnson "clearlisted" the lands at issue, 38 sections totally or partially within the boundaries of the Fort had been subject to exploratory drilling. Of these 38 drilled sections, 23 (61%) were in commercial production, 10 (26%) had "shows" of gas. Only five sections (13%) had resulted in "dry" holes with neither a reported show of gas or production. (Ex. 26)

55. At June 29, 1979, three out of every four drilled sections north and south and two out of every three drilled sections east and west of the lands in question were in commercial production. (Ex. 26; Tr. 828, 829)

56. As early as 1968, the Arkansas Oil & Gas Commission by resolution expressed an opinion that the land in Fort Chaffee consisting of approximately 76,000 acres is an area "characterized by highly potential natural gas reserves" and that the area "embraces portions of at least five known geologic structures." (Ex. 1, Tr. 31)

57. By letter of July 19, 1968, to the USGS in Tulsa, the Commission listed the Grosse, Massard Prairie, Big Creek, Biswell Hill, Backbone, Game Hill, Pine Ridge, and Washburn Anticlines as "having possibilities" within the Fort Chaffee area. (Tr. 46)

58. At the time Mr. Johnson made his decision to lease the lands in question noncompetitively, commercially producing gas wells were present on the Biswell Hill, Washburn and Game Hill Anticlines. (Ex. 26, Ex. 34, Tr. 118, 127, 255, 256, 257, 258, 358, 359, 360, 363, 364, 377, 378, 402)

59. On the Biswell Hill Anticline, as many as eight producing wells, one testing well and three wells with shows of gas (indicating the presence of a gas reservoir, (Tr. 598)) existed on June 29, 1979, as was evidenced by the testimony of Mr. Black, Dr. Bartlett, and Exhibits 26 and 34.

60. As to the Washburn Anticline, there is no dispute. (Horton testimony, Tr. 741) Commercial gas production has existed on the Washburn since at least 1958. (Ex. 26, Ex. 34, e.g., Sec. 8, T6N, 28W)

61. As to the Game Hill Anticline, Dr. Bartlett testified it had commercial gas production prior to June 29, 1979 (Tr. 377–378), the wells for example in Sec. 8, T7N 28W, Sec. 4 and 5, T7N 29W, as shown on Exhibits 26 and 34 clearly fall within the Game Hill Anticline, and no witness disputed the fact of production within the boundaries of that anticline.

62. From 1970 through 1975, competitive bidding for at least 17 sections within the Fort took place in connection with leasing to protect the government lands from drainage by lands outside the Fort. (Ex. 12, Ex. 26)

63. The successful bids in those years ranged from $46.00 to $200 per acre as shown by the following data from Exhibits 11, 12 and 26:

| Section | Date | Successful Bid | Distance from Lands in Question |
|---------|------|----------------|---------------------------------|
| 12/7N32W | 1970 | $ 91.40 | 5 sections |
| 13/7N32W | 1971 | 51.37 | 5 sections |
| 18/7N31W | 1970 | 46.00 | 4 sections |
| 7/7N31W | 1971 | 91.00 | 3 sections |
| 34/8N31W | 1972 | 121.25 | 3 sections |
| 35/8N31W | 1972 | 121.25 | 3 sections |
| 36/8N31W | 1973 | 121.25 | 3 sections |
| 2/7N31W | 1975 | 200.00 | 2 sections |

| Section | Date | Successful Bid | Distance from Lands in Question |
|---|---|---|---|
| 1/7N31W | 1972 | 52.40 | 2 sections |
| 6/7N30W | 1972 | 78.25 | 2 sections |
| 5/7N30W | 1972 | 78.25 | 2 sections |
| 7/7N30W | 1975 | 151.51 | 1 section |
| 8/7N30W | 1975 | 151.51 | 1 section |
| 9/7N30W | 1972 | 52.40 | Adjacent |
| 10/7N30W | 1972 | 52.40 | Adjacent |

64. Sections 11 and 12 of 7N31W, each one section distant from the lands in question were offered for competitive bid in 1974. Bids of $151.51 per acre were made on each section and rejected by USGS as too low. (Ex. 12, Ex. 26)

65. Arkla had requested that sections 15, 16 and 17 of 7N30W be placed for competitive bidding in 1974, but USGS declined to do so. (Ex. 9, Ex. 10, Ex. 12) Section 15 is within the lands in question.

66. As early as 1969, prior to the subsequent nearby development (Ex. 10), Arkla had specifically requested the opportunity to drill on the entire western 25 sections of the lands in question.

67. The Department of the Interior admits in the Girard report (Ad.Rec. 13a, pp. 17–18), "[t]here was no need to 'stimulate' exploration on the lands in question, because the exploration interest is already there."

68. Subsequent to June 29, 1979, on January 2, 1981, additional lands on Fort Chaffee immediately adjacent to the lands in question, were offered for competitive leasing. These lands were leased competitively for prices up to $4,007.00 per acre. (Ex. 11, 12, received subject to later determinations; Tr. 142–155) More than $42,983,000 was bid. (Tr. 151)

69. Two recent reviews of federal leasing have resulted in recommendations that competitive leasing be expanded. An Interior Department staff committee studied the question in 1963 and recommended legislation which would have allowed the Secretary to require competitive bids for all lands lying within the exterior boundaries of an area known or believed to be within a productive geological province. Ad.Rec. 13 at 4. In 1970, the Public Land Law Review Commission concluded that competitive sales should be held whenever competitive interest can reasonably be expected. *Ibid.*

70. The Secretary of the Interior is vested with discretion in determining the extent of geologic structures. 30 U.S.C. § 189.

71. USGS is not permitted to "clearlist" an area for noncompetitive leasing until it has first done its geology on the area. (Tr. 467, 502, 737–738)

72. If a well is drilled and produces gas, the land drilled is "presumptively productive" and, therefore, within a KGS.

73. With respect to land that has not been drilled, the KGS determination cannot rationally be made without studying the stratigraphy, porosity, permeability, water and gas pressure. Available data in this regard include daily drilling reports, logs, isopachs, structure maps, reservoir pressure, hydrocarbon saturation and calculated porosity.

74. Over 200 wells had been drilled in the area in and around Fort Chaffee at June 29, 1979. (Ex. 26) A vast amount of geologic information was available as a result of the drilling of these wells and the exploration, public hearings, statutory and regulatory record keeping, and professional and scholarly articles dealing with the geology of the area.

75. This information was generally consolidated with the Arkansas Oil and Gas Commission at its offices in Fort Smith and El Dorado, Arkansas, at the USGS offices in Tulsa, Oklahoma, and Little Rock, Arkansas.

76. Mr. Johnson had various data available to him. It is undisputed that as of June 29, 1979, the lands in question were virtually surrounded by producing wells. Further, 61% of the drilled sections within the Fort were in commercial production and an additional 26% had shows of gas. 75% of the drilled sections north and south of the lands in question, and 66% of the drilled sections east and west of the lands in question, were in commercial production. Commercial

wells were in production on the Biswell Hill, Washburn and Game Hill anticlines.

77. Technical data available to Mr. Johnson also includes the following:

| Type of Data | AOGC/ Ft. Smith | USGS Tulsa | USGS Little Rock | Use |
|---|---|---|---|---|
| National Gas Policy Act Determinations | T13 | | | Determine producing zones, T82; prepare isopachs, T19 |
| Electric Logs | T14 | | T79 | |
| Lithologic Logs | | | T79 | Cross sections, T21 |
| Well Production Records | T14 | | | |
| Well Completion Reports | T15 | | T80 | |
| Dual Induction Lateral Logs | T15 | | | Show strata; develop structural maps, T17 |
| Formation Density Compensating Neutron Logs | T15 | | | Determine porosity T16, 52, 53 |
| Temperature Logs | T15 | | | Indicates presence of gas, T20 |
| Annual Reservoir Pressure Reports | T18 | | | Determine areal extent of reservoirs T18, 58, 59, 370, 371 |
| Subsurface structure maps reaching into Ft. Chaffee and TXO lease area | T19,61 | T82 | | |
| Arkansas Field Rule Hearings | T20 | | | Designate rules for area's new pools, T20 |
| Cross sections of Ft. Chaffee area | | | T80,81 | |
| Seismic Data on TXO Lease area | | Ad.Rec.13a p. 13; Johnson depo., p. 109 | | |
| PI Reports | | T45 | T80 | |
| Arkla daily drilling reports, well logs, & completion reports for wells in sec. 6,7,8 &9/7N30W | | T259; 28, 29 | | |

78. Mr. Johnson used a map in his Tulsa office for clear listing. (Johnson depo. pp. 43, 76) Information was posted on the map by a draftsman who posted completed wells on the map. (Johnson depo., pp. 45–46)

79. Mr. Johnson admitted that his clearlisting map could not be recreated because it could have had mistakes on it.

80. Only well number, production and depth were reflected on the map. The map contained no information about geological structures, such as anticlines, no information about well completion dates, no information about depths of production, nor about shows of gas, nor height above sea level. (Johnson depo., pp. 76, 78–80) The map also showed the boundaries of KGSs, as previously determined by Mr. Johnson's office. (Johnson depo., pp. 177–178)

81. The information on the map was prepared from data obtained from the Petroleum Information Company, a private commercial reporting company. The data frequently contains faulty information.

82. KGSs are extended incrementally through the use of a "stepping-out" process.

In order to extend a KGS, there must be production from each successive trap. (Tr. 650)

83. Mr. Johnson testified that in making KGS determinations in recent years, he would consider at most only the adjacent sections to a new producing well for purposes of expanding the KGS. (Johnson depo., p. 180, Tr. 744)

84. As a result of the application of the One Section rule to those lands which Mr. Johnson previously considered as being available for leasing, it was impossible for Mr. Johnson to have considered any of the lands in the interior of Fort Chaffee for possible inclusion in (or exclusion from) a KGS at any time prior to June 29, 1979. In fact, Mr. Johnson testified that he never had considered those lands for possible inclusion in a KGS.

85. He would not move a KGS beyond an adjacent section to a producing well under any circumstances in Arkansas because he "had been criticized" for doing so. (Johnson depo., p. 197)

86. Mr. Johnson used a definition of KGS that allowed him to expand a KGS into an area only if he thought that area would produce from the same specific trap, pool or reservoir as was producing in an adjacent section (Johnson depo., p. 193, Tr. 744)

87. This definition precluded Mr. Johnson from evaluating any of the structural or other scientific data available in determining the extent of a specific trap.

88. The procedure allegedly employed by Mr. Johnson would allow the expansion of a KGS area into an adjacent section only if Mr. Johnson felt the same specific trap extended that far. In reality, however, whenever a new producing well was reported, the adjacent squares were merely relabeled as KGS by a draftsman. In making these determinations, Johnson utilized none of the geological data available to him, and little, if any, of his expertise and training as a geologist. His approach was primarily, if not wholly, a clerical one which could have been done by almost anyone, with little or no geological training.

89. According to Mr. Emmett Finley, former DOI employee, it is not department policy to include production trends in a KGS just by virtue of the existence of such a trend. Under legislation pertaining to Alaska mineral lands, a "favorable geologic province" concept is used. This is broader than the KGS concept now applied by the department. (Tr. 764)

90. Mr. Horton testified that the definitions explained in his testimony were those used by the department while Mr. Finley was employed there. Mr. Finley's interpretation as set forth in testimony was broad and under Mr. Finley's interpretation, the entire Arkoma Basin would have been made a KGS. (Tr. 643–645, 652)

91. Dr. Bartlett further testified that "presumptively productive" meant that "odds are that gas will be found." (Tr. 395) This is a much broader interpretation than the current DOI interpretation. See Tr. 647–648. (Tr. 688–689)

92. It is clear that what occurred in this case is that when oil or gas was located, the initial KGS was administratively assumed to be the equivalent of the state's well-spacing unit, in this case, one mile. Ad.Rec. 13.

93. The process of "clearlisting" is merely the application of KGS "determinations" to submitted non-competitive lease request forms.

94. When a non-competitive lease application comes in, it is checked, the KGS map is checked to make sure that it is up to date, and then the proposed lease areas are checked against it to determine whether they are in a KGS, a process known as clearlisting. (Johnson depo., p. 47)

95. Although KGS determinations were made on an ongoing basis over a period of years, this merely means that the current KGS map reflects years of application of the "adjacent square" rule.

96. As Mr. Horton made abundantly clear, Mr. Johnson did not make a KGS decision for the lands in question, he only "clearlisted" these lands (Tr. 711), a separate function from a KGS determination. (Tr. 711–712)

97. No KGS determination has ever been made for the lands in question except to the extent the lands were "clearlisted." The clearlisting process includes no mineral evaluation (Tr. 714) and is literally a rubber stamping process. (Tr. 712)

98. It was Mr. Johnson's view that the KGS determination for the lands in question had, in effect, been made by the earlier KGS determinations around the lease area (Johnson depo., pp. 118, 119), made under his one section rule.

99. The evidence is overwhelming that Mr. Johnson had easily available to him an enormous amount of relevant and important geological information that he neither used nor considered using in making his "clearlisting" decision.

100. In making the decision, Mr. Johnson did not use seismic data available in the USGS office (Johnson depo., p. 109) and referred to in the Girard report (Ad.Rec. 13a at p. 13). He did not use and testified he did not know the use of a density neutron log (Johnson depo., p. 110) which is clearly an essential tool in determining porosity (Tr. 16, 52) and, indeed, he stated that calculated porosity was of no value in making a KGS determination, nor was hydrocarbon saturation considered. (Johnson depo., p. 116) He was uncertain about how to use temperature logs (Johnson depo., p. 111) on wells in or around the Fort.

101. He did not consider or use "shows" of gas as a basis for reaching conclusions as to the presence or extent of reservoirs (Johnson depo, pp. 114, 115), although all expert witnesses, including Dr. Zachry (Tr. 598), testified that shows of gas indicated the presence of a reservoir, and Mr. Finley testified that shows could "definitely" be used to extend a KGS. (Tr. 465)

102. Daily drilling reports which were available at USGS for wells in at least Sections 6, 7, 8 and 9 of T7N, R30W, on the Fort (Tr. 259), and which are helpful in determining the extent of reservoirs (Tr. 260) were not considered by Mr. Johnson. He said such reports were of "no value" in making a KGS determination. (Johnson depo., pp. 115–116)

103. He did not consider including in a KGS any of the sections of the lands in question directly or diagonally offset by producing wells (Ad.Rec. 13a, p. 15), although Mr. Horton testified that he could have included those sections as KGS. (Tr. 750)

104. He did not develop any subsurface maps of producing intervals although Mr. Horton said he could have done so with the data available. (Tr. 750–751) No effort was made to construct cross sections of the lease area. (Johnson depo., p. 117)

105. He did not consider the possible presence or lack of any faults in the area. (Johnson depo., p. 86)

106. Mr. Johnson testified that he did not perform the geological studies or use any of the scientific or structural data the government's own witness stated "should be used." (Tr. 743)

107. Mr. Johnson did not consider the lands' high probability of production and made no report to the Secretary on the mineral value of the lands or the high degree of competitive interest in the lands.

108. The types of information listed in Findings 96 through 107 were not given by the USGS to the Secretary or to the Bureau of Land Management for use in exercising the discretionary decision as to whether to lease any or parts of the lands in question.

109. Mr. Haley testified that there were too many productive wells for Mr. Johnson not to have considered the possibility that he should extend the KGSs more than one mile.

110. Dr. Charles Bartlett, the witness with the most extensive knowledge of the geology of the area in question, described the procedures that Mr. Johnson used to govern his decision on the lands in question as so simple that no geologist would be needed and as "completely arbitrary" and requiring "no geologic thinking whatsoever." (Tr. 376, 438)

111. The forms used by TXO to apply for leases on the lands in question, which are the same forms used by the government

to issue the leases, are designated as "Offer to Lease and Lease for Oil and Gas—Noncompetitive Acquired Lands Lease—Form 3110–3 (September 1973)." (Ad.Rec. Nos. 15–34) Those forms (Form 3110–3) were not submitted by the Secretary of the Interior to the Secretary of Energy for review, modification, approval or disapproval at any time prior to the purported issuance of the leases in 1979. (Ad.Rec. Nos. 3–6; admissions in Ad.Rec. 8–9) Nothing in the record of this action indicates that the Secretary of Energy ever gave subsequent or retroactive approval of these forms.

112. On June 29, 1979, Mr. Johnson did not review any of the documents lodged with this Court and designated by the government as either "Administrative Record" or "Supplementation to the Administrative Record," with the exception of the TXO lease applications themselves. (By implication)

113. The "author" of the "known geological structure" language was Mr. Max W. Ball, former Chairman of the Oil Board of the Geological Survey (Tr. 458–59)

114. In the *Hearings Before the House Committee on the Public Lands on H.R. 3232 and S. 2812,* 65th Cong., 2d Sess. (1918), Mr. B.F. Rice testified that

... an arbitrary distance in the oil business is not very satisfactory. It is in fact entirely unsatisfactory, because the arbitrary distance has nothing to do with the value of the land for the production of oil.

\* \* \* \* \* \*

That ("geologic structure") means a formation favorable to production, so far as it can be ascertained....

115. Mr. Max W. Ball testified in the same hearing that "geologic structure" was equivalent to "domes and anticlines":

I would say either substitute the Senate wording which is geologic structure, or the wording suggested by Mr. Hares in the letter read yesterday ("domes and anticlines").

116. In Conference Committee hearings of May 24, 1918, Mr. Elston said:

There is no logic or any scientific reason for the (former) 10-mile limitation, because everything the gentleman says is true. Within a few miles from a producing well you can have a different geological structure and that territory be as wildcat as anything and you cannot find anything.

56 Cong.Rec. 7052 (May 24, 1918).

117. There is no evidence that Congress was aware, at the time of finally adopting the "known geological structure" language, of the Department of the Interior's definition of that term.

118. Even had Congress been aware of the department's definition of a KGS, that definition was crucially broader than that now urged by the department and as applied. *Compare Earl Bruesselback,* A–28061 (Oct. 26, 1959), with Johnson depo. at 150–151.

119. A single producing trap of the stratigraphic nature characteristic of portions of the Fort Chaffee area can be as wide from east to west as three miles and as long from north to south as fifteen miles.

120. There is no rational basis underlying the application of the "one-mile" rule to Fort Chaffee where mineral development has been wholly precluded in the past by statute.

121. In regions of the nation open to exploration and development for decades, it is possible that a rational basis exists for a mileage system, in that it is likely that the industry would have prospected likely development areas and thus tested the boundaries of KGSs.

122. The clearlisting procedure utilized by Mr. Johnson has an inherently high probability of allowing clearlisting of lands which will ultimately be proven to be within a KGS in the Fort Chaffee area.

123. The noncompetitive acquired land leases awarded to TXO were not submitted to the Secretary of Energy in compliance with then-existing Department of Energy Organization Act requirements.

124. The Administrative Record properly reviewable by this Court consists of Ad. Rec. 1, Ad.Rec. 3–9, Ad.Rec. 13a, Ad.Rec. 15–34, Ad.Rec. 39–52, Ad.Rec. 56–74.

*Conclusions of Law*

This action is before the Court pursuant to 28 U.S.C. § 1331, 5 U.S.C. §§ 702, 704, 30 U.S.C. §§ 191, 355, 42 U.S.C. § 7101 *et seq.* The Court has jurisdiction of the subject matter and of all parties. Venue is properly laid herein. 28 U.S.C. § 1391.

The scope of review of the administrative actions challenged herein is that this Court is required to hold unlawful and set aside the actions, findings, and conclusions which are arbitrary, capricious, an abuse of discretion, not in accordance with law, or without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (D).

This Court in reviewing the administrative action must consider whether the procedures employed conform to the procedural requirements of the Administrative Procedure Act, as well as the Interior Department's own internal procedures and any other applicable statutory requirements. *Oglala Sioux Tribe of Indians v. Andrus,* 603 F.2d 707 (8th Cir.1979).

In consideration of the administrative decision, this Court must consider whether the decision was based on a consideration of the relevant facts and whether there has been a clear error of judgment. *Citizens Committee to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

Congress, through the 1976 Amendments to the Mineral Leasing Act, immediately opened Fort Chaffee to leasing, notwithstanding the contrary language of 43 C.F.R. § 3101.2–1. *TXO v. Watt, supra.*

The administrative record is limited to the materials, documents, rationales, and justifications actually used, considered and relied upon by the agency official who made the determination at issue. *Securities and Exchange Comm. v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

Agency action cannot be upheld on the basis of *post hoc* rationalizations or arguments and data proffered for the first time on appeal. *Volpe, supra; Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

The term "known geological structure" is contained in section 17 of the Mineral Leasing Act, 30 U.S.C. § 226(b)(1), which provides, *inter alia,* that:

If lands to be leased are within any known geological structure of a producing oil or gas field, they shall be leased to the highest responsible bidder by competitive bidding. . . .

The Congressional intent in adopting the term "known geological structure" can be ascertained from the Congressional history of the Mineral Leasing Act. This Congressional intent may be ascertained from the *Hearings Before the House Committee on the Public Lands on H.R. 3232 and S. 2812,* 65th Cong., 2d Sess. (1918); *Hearings Before the Senate Committee on Public Lands on H.R. 406,* 64th Cong., 1st Sess. (1916), and the Congressional Record.

The legislative history indicates that the term "geological structure" was intended to refer to producing domes or anticlines.

The legislative history indicates that Congress, in enacting the Mineral Leasing Act, intended to encourage exploration and development of areas in which the exploration interest was then relatively small and the risk relatively high. Conversely, Congress intended to promote competition in those areas in which exploration interest was already present and the risks substantially smaller. *See also Atlantic Richfield Co. v. Hickel,* 303 F.Supp. 724 (D.Wyo.1969), *aff'd,* 432 F.2d 587, 589 (10th Cir.1970).

In 1935, Congress replaced the term "known geological structure" with "known or believed to contain oil or gas deposits." In 1946, Congress reverted to the "geologic structure" language to end the confusion in the industry that resulted from the 1935 revision. *See Hearings Before the Senate Committee on Public Lands and Surveys,* 79th Cong., 2d Sess. (1946).

The current departmental regulation defining "known geological structure," adopted in 1970, equated this term with:

... technically the trap in which an accumulation of oil or gas has been discovered by drilling and determined to be productive, the limits of which include all acreage that is presumptively productive.

43 C.F.R. § 3100.0–5(a) (1979) is clearly inconsistent with the Congressional intent that "known geological structure" be equated with "domes and anticlines."

In *Wilmer Jeannette,* 49 I.D. 582 (Oct. 16, 1920), the Department of the Interior expressly considered the "incentive" factor in a KGS determination. In *Practice Applicable to the Issuance of Oil and Gas Prospecting Permits and Extensions of Time for Compliance with Drilling Requirements,* 50 I.D. 546 (June 3, 1924), the department's policy officially adopted the incentive factor in KGS determinations and recognized a broader KGS definition than the one now urged by the department. In *H.A. Hopkins,* 50 I.D. 213 (Dec. 18, 1923), the department officially defined a KGS in a manner similar to that now urged by plaintiffs. The department utilized a broad application and definition of KGS "traps" for at least four decades after the passage of the Act. See *John P. Dever,* 67 I.D. 367 (1960); *Earl Bruesselback,* A–28061 (unreported) (Oct. 26, 1959).

The Congressional History indicates that Congress, in delineating the boundaries between KGS and non-KGS lands, has rejected a system of arbitrary mileage.

The clearlisting procedure utilized in the instant case as an application of the KGS determination to TXO's lease request forms was inconsistent with the language and meaning of section 17 of the Mineral Leasing Act.

The clearlisting procedure was arbitrary because it was not based upon the clearly defined relevant factors for making a KGS determination. And this is so even if Congress intended the KGS area to be the "trap" area. The procedure was arbitrary in that it ignored the previous statutory unavailability of any meaningful industry testing, exploration or development.

Secretarial Order 2948, signed by Rogers C.B. Morton, then-Secretary of the Interior in 1972, evidences the departmental policy and Congressional intent that competitive interest be considered by the Secretary in exercising his discretion. The clearlisting procedure employed by Mr. Johnson failed to comply with the spirit of the Order and with sections 3(b) and 4 of the Order which require reports on proposed transactions and mineral evaluation data to be submitted to the Bureau.

In 1977, Congress enacted the Department of Energy Organization Act to, among other things, foster and assure competition among parties engaged in the supply of energy and fuels.

The DOE Act, as in effect as of July, 1979, transferred to the Secretary of Energy the functions of the Secretary of the Interior to promulgate regulations under the Mineral Leasing Act for Acquired Lands and Mineral Lands Leasing Act, relating to the fostering of competition for Federal leases. Section 303(c)(1) required the Secretary of the Interior to afford the Secretary of Energy at least thirty (30) days' notice prior to prescribing the terms and conditions on which a lease will be issued, and the Secretary of Energy could then disapprove a term or condition.

The Appropriations Act for the Department of the Interior—Fiscal Year 1982, Pub.L. No. 97–100, Title II, § 201, 95 Stat. 1407 (Dec. 23, 1981), repealed §§ 302(b), 302(c) and 303(c) of the DOE Act. This repeal, however, repealed only the transfer of the duty of fostering competition to the Secretary of Energy, not the substantive obligations of the Secretary of the Interior.

Having considered the objections to portions of the depositions of Joseph R. Binford, Jeff Holdren, and Edward Johnson, the Court concludes that to the extent said portions were relied upon by the Court with respect to the findings of fact and conclusions of law expressed herein, said objections are overruled.

All evidence admitted at the trial of this cause other than what the Court has determined to be the Administrative Record was admitted for the purposes of delineating the scope of the Administrative Record, deter-

mining the adequacy or inadequacy of the facts considered by the Secretary and providing the Court with technical understanding of the data submitted.

The non-competitive Fort Chaffee leases issued to TXO, "clearlisted" by Mr. Johnson in June, 1979, are invalid for the reasons set forth in these findings of fact and conclusions of law.

The Secretary of the Interior should be enjoined from issuing further leases of the Fort Chaffee mineral lands until a proper KGS determination is made by the United States Geological Survey.

In making any future KGS determinations, the following factors, among others, need be considered: the Congressional intent in exploration and development of areas in which the exploration interest is relatively slight and the risk relatively great; the Congressional intent to promote competition in those areas wherein exploration interest is already present and the risks substantially less; that Fort Chaffee was statutorily closed to exploration and development until 1976; the data and reports required by Secretarial Order 2948 and any other statutes or rules must be updated and considered prior to the issuance of a lease; the percentage of productive sections within the Fort, including "shows," and the percentage of productive sections surrounding the Fort; the technical data listed in Finding No. 77 must be considered; an arbitrary mileage system of "stepping out" may not be used; all geological data currently available to the department, including production trends, need be considered; in determining and applying the true definition of the term "known geological structure" consistent with Congressional intent, the clearly expressed Congressional purpose in providing the State of Arkansas and its counties and schools with a "fair" return on the value of the lands and minerals acquired from the State of Arkansas by the federal government, should be considered.