734 F.2d 347
 ARKLA EXPLORATION COMPANY and State of Arkansas, Appellees,
v.
TEXAS OIL & GAS CORP., Appellant.
James G. Watt, Secretary of Interior. (Two cases).
ARKLA EXPLORATION COMPANY and State of Arkansas, Appellees,
v.
TEXAS OIL & GAS CORP., James G. Watt, Secretary of Interior,
Appellant. (Two cases).
 Nos. 82-2228, 82-2386, 83-1586 and 83-1682.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 15, 1983.
Decided May 7, 1984.
 
 F. Henry Habicht, II, Acting Asst. Atty. Gen., W. Asa Hutchinson, U.S. Atty., Fort Smith, Ark., Anne S. Almy, Michael W. Reed, Robert L. Klarquist, Attys., Dept. of Justice, Washington, D.C., for appellant; Mark K. Seifert, Atty., Dept. of the Interior, Washington, D.C., of counsel.
 Jim Guy Tucker, Mitchell, Williams, Selig, Jackson & Tucker, Little Rock, Ark., Robert Roberts, III, Blanchard, Walker, O'Quin & Roberts, Shreveport, La., Alan S. Novins, Lee Ellen Helfrich, Paula Dinerstein, Lobel, Novins & Lamont, Washington, D.C., for appellees.
 Before LAY, Chief Judge, and JOHN R. GIBSON and BOWMAN, Circuit Judges.
 BOWMAN, Circuit Judge.
 
 
 1
 Under the Mineral Lands Leasing Act (MLA), 30 U.S.C. Secs. 181-287, before government lands may be leased for oil or gas exploration without competitive bidding, the Secretary of the Interior (the Secretary) must determine that the lands are not within a "known geological structure of a producing oil or gas field" (KGS). Id. at Sec. 226. At issue in this case is whether the Secretary made a proper KGS determination before granting valuable oil and gas exploration leases to Texas Oil and Gas Corporation (TXO) on a noncompetitive basis. The District Court for the Western District of Arkansas* held that the Secretary's determination was improper and, therefore, that these leases were not validly issued. The Secretary and TXO appeal from that decision. For the reasons stated herein, we affirm the decision of the district court.
 
 Procedural History
 
 2
 The twenty noncompetitive leases in question, covering lands located on the Fort Chaffee Military Reservation in Arkansas, were issued to TXO on July 1, 1979. Having learned of these leases, Arkla Exploration Company (Arkla) filed an administrative protest against their issuance with the Department of Interior (the Department) on September 17, 1979.[1] On September 20, 1979, the Secretary ordered the United States Geological Survey (USGS, now known as the Minerals Management Service) to re-evaluate its non-KGS classification of the subject lease land. On September 21, 1979, Arkla filed suit against the Secretary in the District Court for the District of Columbia (D.C.District Court), seeking cancellation of the leases.[2]
 
 
 3
 In response to these developments TXO, on November 1, 1979, sought from the D.C. District Court an order temporarily restraining the Secretary from canceling its leases. A hearing on the TRO was scheduled for November 2, 1979. On the evening of November 1, 1979, the Secretary invalidated the leases, reasoning that they had been issued without proper authority, notwithstanding the passage of an amendment to the MLA permitting the granting of leases on acquired military lands such as Fort Chaffee, see infra note 6 and accompanying text, because the lease applications had been filed prior to the effective date of the Department's implementing regulations.
 
 
 4
 TXO subsequently converted its suit for a TRO to one for permanent relief. The D.C. District Court held in favor of the Secretary. Texas Oil & Gas Corp. v. Andrus, 498 F.Supp. 668 (D.D.C.1980). The court found that the Secretary's decision to invalidate the leases was based on his reasonable interpretation of the Department's regulations and was not the result of improper political motivation.[3]
 
 
 5
 The Court of Appeals for the District of Columbia Circuit (D.C. Circuit) reversed, Texas Oil & Gas Corp. v. Watt, 683 F.2d 427 (D.C.Cir.1982), rev'g Texas Oil & Gas Corp. v. Andrus, supra, and on July 20, 1982, directed the Secretary to reinstate the leases.[4] The court refused to allow the Secretary to invalidate the leases based on his interpretation of Department regulations because to do so would unilaterally defer the effective date of the amendment to the MLA and thus would thwart Congressional intent to open these lands for leasing.
 
 
 6
 The instant action attacking the KGS determination was commenced by Arkla on August 4, 1982. The State of Arkansas petitioned the court for leave to intervene on August 18, 1982.[5] The district court has issued two opinions in the case. In the first opinion, the court permitted the State of Arkansas to intervene, and overruled various jurisdictional objections raised by the defendants. Arkla Exploration Co. v. Watt, 548 F.Supp. 466 (W.D.Ark.1982). In the second opinion, the court ruled on the merits. Arkla Exploration Co. v. Watt, 562 F.Supp. 1214 (W.D.Ark.1983). The court reviewed the administrative record, admitted supplementary and explanatory evidence, made findings of fact, and ruled that the Secretary's determination that the lands in question fell outside a KGS was arbitrary and contrary to Congressional intent, federal statutes, and the Department's regulations. The court enjoined the Secretary from reinstating the leases and ordered the Secretary to make a proper KGS determination on the lands in question prior to the issuance of any further leases.
 
 Background
 
 7
 In 1975, Congress passed an amendment to the MLA authorizing for the first time minerals leasing (other than for drainage purposes) on government lands acquired as military reservations, as distinguished from lands that always have been in the public domain.[6] Fort Chaffee is among the lands opened for leasing under this statute. Geologically, Fort Chaffee is located in the Arkoma Basin, which has been a very productive natural gas area for many years. The area surrounding Fort Chaffee contains numerous producing wells. A study of maps included in the administrative record reveals that no part of Fort Chaffee was more than five miles from a producing well at the time the leases in question were granted. Designated Record (D.R.) at 1115. The maps also show that much of Fort Chaffee is within the Biswell Hill, Game Hill, or Washburn Anticlines,[7] each of which contained producing wells at the time these leases were granted.
 
 
 8
 In May 1977, TXO applied to the Bureau of Land Management (BLM) for thirty eight noncompetitive oil and gas leases on 78,000 acres located in the Fort Chaffee Military Reservation. Departmental procedures assigned to the Area Geologist of the USGS the responsibility for determining whether the lands in question were located within a KGS. For Fort Chaffee, the Area Geologist at that time was Edward L. Johnson in the Tulsa, Oklahoma USGS office. Johnson went to work for USGS in 1956, and had worked in the Tulsa area since at least 1961.
 
 
 9
 Johnson took the TXO applications and compared them to a map of the Fort Chaffee area. This map displayed the wells drilled in the Fort Chaffee area as reported by the Petroleum Information Co., a petroleum reporting service. Each well, both producing and dry wells, was entered on the map by a draftsperson in Johnson's office. Johnson then would indicate the location of each KGS on the map, including in the KGS, for each well producing in commercial quantities, the section (a section is one square mile) in which the well is located plus the surrounding eight sections. This practice, referred to in the district court as the "one mile stepout," had its roots in Ark.Stat.Ann. Sec. 53-114 (1971 & Supp.1983), which gives the Arkansas Oil and Gas Commission the authority to set spacing units for oil and gas wells in Arkansas, i.e., no wells can be drilled closer than the minimum spacing unit set by the Commission.[8] Occasionally, if the well was a noncommercial well, i.e., a well that produced but which did not produce enough to cover the costs of production, Johnson would include only the single section in which the well was located. It was his practice not to extend any KGS more than one section beyond the section in which the well was located. In fact, Johnson had been "criticized" on occasions when he had attempted to extend a KGS farther than one section, and had stopped even attempting to do so.
 
 
 10
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLEThe process followed by Johnson in approving the TXO leases is called clearlisting. Theoretically, prior KGS determinations already were represented on the map in his office. In dealing with the TXO applications, he identified the areas sought to be leased on the map and determined if any of them were within an area previously identified through the one-mile stepout procedure as a KGS. This process took Johnson approximately three and one-half hours. It resulted in the deletion of about 45,000 acres from TXO's application and left about 33,000 acres available for noncompetitive leasing. Twenty noncompetitive leases encompassing those 33,000 acres were approved in this manner by Johnson and forwarded to the BLM, where they were approved and issued to TXO on July 1, 1979.
 
 
 11
 In reviewing the Secretary's decision to issue the leases without competitive bidding, Judge Waters was faced with an administrative record of approximately 1580 pages. The record consisted primarily of TXO's lease applications, the leases, and a number of articles and reports describing the geology of the Fort Chaffee area, several of which had been written by experts who testified at trial. The record also included some prior KGS determinations on which the clearlisting decision for the TXO leases had been based. In only one of these prior KGS determinations had the Tulsa office extended a KGS farther than the ordinary one-mile maximum from a producing well--the Washburn Anticline KGS determination, made on October 29, 1963. D.R. at 235-39. None of the KGS determinations made after that date extend more than one section beyond a producing well. Indeed, a review of the KGS determinations made under the one-mile stepout procedure gives one little indication of any geologic research or analysis conducted in connection with such determinations. The language of the reports accompanying each successive determination is so similar as to resemble boilerplate.
 
 
 12
 The administrative record also contains the Girard Report. Prepared by O.W. Girard, a USGS geologist, this report is the official Department internal review of the KGS determination at issue in the instant case. While the report concludes that the KGS determination was correct "in a legal sense," it also concludes that "more comprehensive use" could have been made of the geologic data available to the Tulsa office, "such as constructing a variety of subsurface geological and reservoir engineering maps in order to 'geologically' confirm the determination." D.R. at 415-16. The Girard Report also notes the total failure of the Tulsa office to consider exploration interest in the Fort Chaffee area in making the KGS determination and the clearlisting decisions for the TXO leases. Id. at 416-17.
 
 
 13
 A crippling weakness of the administrative record was the omission of the map used by the Tulsa USGS office in making the clearlisting decisions. By the time this case reached the district court, the map no longer existed. Without this map, it was impossible for Judge Waters to know which wells surrounding the lease area were considered and which were not considered in making the KGS determination and the clearlisting decisions here at issue. In his deposition, Johnson testified that the map could not be recreated because it may have had mistakes in it. Johnson deposition at 76-77.
 
 
 14
 Judge Waters was confronted with an administrative record that raised many more questions than it answered about the basis of the Secretary's decision. He therefore found it necessary to admit a limited amount of additional information, including testimony from Johnson and his superiors, to determine the true scope of the administrative record and cure its factual deficiencies, particularly the lack of the map used in making the clearlisting decisions.
 
 
 15
 Even if the administrative record had been complete, Judge Waters was faced with another problem--the highly technical nature of the field of petroleum geology. Judge Waters is not a geologist and, without what amounted to a short course in the subject, given in open court by experts for both plaintiffs and defendants, he could not have been expected to review the administrative record intelligently. As Judge Waters explained:
 
 
 16
 All evidence admitted at the trial of this cause other than what the Court has determined to be the Administrative Record was admitted for the purposes of determining the scope of the Administrative Record, delineating the adequacy or inadequacy of the facts considered by the Secretary and providing the court with technical understanding of the data submitted.
 
 
 17
 562 F.Supp. at 1226-27.
 
 Issues
 
 18
 TXO and the Secretary argue for reversal on numerous procedural and jurisdictional grounds: (1) improper venue; (2) lack of standing; (3) unavailability of a cause of action; (4) failure to exhaust administrative remedies; (5) statute of limitations; and (6) collateral estoppel. They also argue that the standard of review applied by the district court was improper and that the Secretary's KGS determination was correct. We address these issues in turn.
 
 Venue
 
 19
 On August 13, 1982, TXO, pursuant to 28 U.S.C. Sec. 1404(a), moved the district court to transfer venue in this case to the D.C. District Court. After a hearing before the district judge, TXO's motion for change of venue was denied. TXO and the Secretary argue that denial of this motion was improper.
 
 
 20
 "A motion for transfer under 28 U.S.C. Sec. 1404(a) is addressed to the discretion of the trial court and its actions will not be disturbed on appeal unless there has been an abuse of discretion." Layne-Minnesota p.r., Inc. v. Singer Co., 574 F.2d 429 (8th Cir.1978). We have examined the record and find that the denial of TXO's motion for change of venue was not an abuse of discretion.
 
 
 21
 The thrust of appellants' venue challenge is that they may be subjected to two orders--one from the D.C. Circuit and one from this Circuit--that are mutually inconsistent. The D.C. Circuit, however, ruled only on the timeliness of TXO's lease applications under applicable federal statutes and has ordered only that TXO's leases be reinstated "[a]s matters stand...." 683 F.2d at 435. That Court did not consider the KGS issue. Its ruling presupposes that the leases were issued in accordance with the applicable law and that the leased lands are not within a KGS. For our Court to require the Secretary to offer these lands for lease only after a lawful KGS determination does not conflict with the decision of the D.C. Circuit, to which this issue never has been presented. Because we hold these leases invalid notwithstanding the timeliness of TXO's application for them, our mandate necessarily supersedes that of the D.C. Circuit. The parties should not have any doubt that the instant decision now controls this matter.
 
 Standing
 
 22
 TXO and the Secretary argue that neither Arkla nor the State of Arkansas has standing to assert the claims now before the Court. Having reviewed the entire record, we conclude that both parties meet the Article III standing requirements.
 
 In order to have standing:
 
 23
 (1) plaintiff must allege an actual or threatened injury as a result of the conduct of the defendant, (2) the injury alleged by the plaintiff must be fairly traceable to the action of the defendant that is challenged in the lawsuit and (3) the injury alleged by plaintiff must be likely to be redressed by a favorable decision of the court.
 
 
 24
 Belles v. Schweiker, 720 F.2d 509, 513 (8th Cir.1983) (citing Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982)).
 
 
 25
 The district court accurately characterized the nature of Arkla's rights.
 
 
 26
 Arkla's asserted right is the right to bid competitively on KGS tracts of land which the Secretary has reasonably classified and offered. Correlatively, they assert the rights to have the lands not classified arbitrarily, to have the Secretary utilize his discretion properly, and the right to bid for all properly categorized and offered KGS lands for potential profit and exploratory public benefit.
 
 
 27
 548 F.Supp. at 471. Arkla alleges injury in that these rights were violated with respect to the subject lease land. The injury alleged by the State of Arkansas is the loss of revenue to which it is statutorily entitled.[9] These injuries claimed by Arkla and the State of Arkansas are fairly and directly traceable to the Secretary's unlawful KGS determination. Moreover, a proper KGS determination will protect Arkla's interest in having an opportunity to participate in a lawful bidding process and Arkansas's statutory revenue interest. Thus, our decision provides redress for the injuries alleged by Arkla and the State of Arkansas. We accordingly hold that the criteria for standing set forth in Belles v. Schweiker, supra, are satisfied.
 
 Availability of Cause of Action
 
 28
 The MLA, 30 U.S.C. Sec. 226-2, clearly contemplates the right of adversely affected parties to seek judicial review of leases awarded by the Secretary. See, e.g., Copper Valley Machine Works, Inc. v. Andrus, 474 F.Supp. 189, 192 (D.D.C.1979), vacated on other grounds, 653 F.2d 595 (D.C.Cir.1981) (recognizing statutory judicial review procedure of Sec. 226-2); Geosearch, Inc. v. Andrus, 494 F.Supp. 978, 979 (D.Wyo.1980) (jurisdiction of court founded on Sec. 226-2). Judicial review must, of course, be sought in a timely fashion, after the avenues of administrative relief have been adequately explored. Arkla and the State of Arkansas meet these requirements and, thereby, have available to them this cause of action.
 
 
 29
 TXO and the Secretary maintain that neither Arkla nor the State of Arkansas has a cause of action in federal court because no private right of action exists under the MLA. In making this argument, appellants rely on Pullman v. Chorney, 712 F.2d 447, 450 (10th Cir.1983) and Naartex Consulting Corp. v. Watt, 542 F.Supp. 1196, 1202-03 (D.D.C.1982), aff'd 722 F.2d 779 (D.C.Cir.1983). But Pullman and Naartex merely refused to imply a private right of action for damages or other relief against private defendants under the MLA. The existence of an implied private right of action against private defendants is one thing; judicial review of an agency decision is quite another. Arkla and the State of Arkansas have sought only judicial review of final agency action, which is precisely what Sec. 226-2 authorizes.[10]
 
 
 30
 TXO and the Secretary also argue that KGS determinations are committed to agency discretion by law and thus are unreviewable under 5 U.S.C. Sec. 701(a)(2). This provision of the Administrative Procedure Act (APA) applies only if there is "clear and convincing evidence" of Congress's intent to preclude judicial review. Abbott Laboratories v. Gardner, 387 U.S. 136, 140-41, 87 S.Ct. 1507, 1510-11, 18 L.Ed.2d 681 (1967). We find no such evidence in this case. TXO and the Secretary point out that 30 U.S.C. Sec. 189 gives the Secretary the authority to determine the boundaries of a KGS, and cite one congressman's comment in the legislative history referring to that section,[11] but they do not point to any express provision of the MLA that precludes review. As stated in Abbott Laboratories: "The right to review is too important to be excluded on such slender and indeterminate evidence of legislative intent." Id. 387 U.S. at 141, 87 S.Ct. at 1511 (quoting Jaffe, Judicial Control of Administrative Action 336, 357 (1965)).
 
 Exhaustion of Administrative Remedies
 
 31
 The TXO leases were granted on July 1, 1979. On September 17, 1979, Arkla filed a timely protest to the issuance of the leases. The Secretary, on September 20, 1979, ordered the USGS to re-evaluate the non-KGS classification of the leased land. On November 1, 1979, the Secretary invalidated TXO's leases. The BLM then dismissed Arkla's protest as moot. TXO and the Secretary argue that Arkla has failed to exhaust its administrative remedies because it did not appeal the dismissal of its protest. We do not agree.
 
 
 32
 Without first being an "adversely affected" party, Arkla had no right to an administrative appeal of the dismissal of its protest. See, e.g., 30 C.F.R. Sec. 290.7; 43 C.F.R. Secs. 4.21, 4.410. By the time Arkla's protest was dismissed, the TXO leases had been invalidated. Therefore, it cannot be said that Arkla was "adversely affected" by an administrative decision when its protest was dismissed on grounds of mootness. After all, the very result it sought--invalidation of the TXO leases--had been achieved. Under the circumstances, an administrative appeal would have been pointless. Thus, on the particular facts of this case, Arkla has done all that was necessary to satisfy the exhaustion requirement.
 
 
 33
 The State of Arkansas never had an opportunity to pursue administrative remedies. It was not an interested party until 1981, when Congress amended the MLA to entitle the states to share in revenues derived from the lease of public lands. See supra notes 5 and 9. At that time, there was no reason for any administrative challenge to these leases because the Secretary had invalidated them. When the D.C. Circuit then issued a mandate ordering the Secretary to reinstate the leases, it became highly improbable that the State of Arkansas could ever obtain relief in the context of an administrative proceeding. "[I]f the agency's limited power to grant relief or the agency's hostile attitude makes it impossible or highly improbable that the litigant will obtain the relief [it] seeks," exhaustion will not be required. West v. Bergland, 611 F.2d 710, 719 n. 11 (8th Cir.1979), cert. denied, 449 U.S. 821, 101 S.Ct. 79, 66 L.Ed.2d 23 (1980).
 
 
 34
 "The doctrine of exhaustion of administrative remedies is not a strict jurisdictional requirement, but rather a flexible concept which must be tailored to the circumstances of the particular case." South Dakota v. Andrus, 614 F.2d 1190, 1192 n. 1 (8th Cir.), cert. denied, 449 U.S. 822, 101 S.Ct. 80, 66 L.Ed.2d 24 (1980). Because of the circumstances mentioned above, we hold that the doctrine of exhaustion of administrative remedies is not a bar to this action.
 
 Statute of Limitations
 
 35
 "No action contesting a decision of the Secretary involving any oil and gas lease shall be maintained unless such action is commenced or taken within ninety days after the final decision of the Secretary relating to such matter." 30 U.S.C. Sec. 226-2. TXO and the Secretary argue that this statute of limitations bars the present action by Arkla.
 
 
 36
 Arkla's original suit challenging the July 1, 1979 leases was filed in the D.C. District Court on September 21, 1979. Thus Arkla brought its initial action within the ninety-day statutory period. On November 1, 1979, the leases were invalidated by the Secretary. Arkla's original lawsuit later was dismissed without prejudice. See supra note 3.
 
 
 37
 Once the Secretary invalidated TXO's leases, there did not exist a situation adverse to Arkla. Moreover, such a situation did not arise until July 30, 1982 when the D.C. Circuit directed that the leases be reinstated. Consequently, Arkla could not have taken any action contesting these leases during the time between the dismissal of its original suit and the D.C. Circuit ruling. One cannot, after all, challenge something that is non-existent. With the issuance of the mandate of the D.C. Circuit, there was a judicial order adverse to Arkla. The present action was commenced within a few days thereafter, on August 4, 1982.
 
 
 38
 "Limitations periods are intended to put defendants on notice of adverse claims and to prevent plaintiffs from sleeping on their rights." Crown Cork & Seal Co. v. Parker, 462 U.S. 345, ---, 103 S.Ct. 2392, 2396, 76 L.Ed.2d 628, 635 (1983). The Secretary has known since September, 1979 of Arkla's opposition to these leases. Furthermore, Arkla has not slept on its rights. It has acted promptly and has done everything to protect its interests in this matter that reasonably could have been expected of it. We hold that the statute of limitations is not a bar to this action.
 
 Collateral Estoppel
 
 39
 TXO and the Secretary maintain that the validity of the leases has been conclusively determined through litigation in the D.C. District Court and an appeal to the D.C. Circuit. They argue that the present action therefore is precluded under the doctrine of collateral estoppel.
 
 
 40
 In this Circuit, use of collateral estoppel is appropriate when:
 
 
 41
 (1) the issue was identical to one in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or in privity with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue.
 
 
 42
 Oldham v. Pritchett, 599 F.2d 274, 279 (8th Cir.1979). We need go no further than the first requirement set forth above.[12] The pivotal issue in the instant action is the validity of a USGS determination that the subject lease property is not within a KGS. This simply was not an issue in the District of Columbia proceedings. See 498 F.Supp. at 670-71 n. 1. Therefore, we find the doctrine of collateral estoppel to be inapposite.[13]
 
 
 43
 Standard for Reviewing the KGS Determination
 
 
 44
 The Secretary's KGS determination may be set aside if it is arbitrary, capricious, or contrary to law or to the Secretary's regulations. 5 U.S.C. Sec. 706(2)(A). The reviewing court must ascertain if the Secretary's decision was based on a consideration of the relevant factors, and in so doing must conduct a "thorough, probing, in-depth review" of the record. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).
 
 
 45
 Appellants correctly point out that when a court reviews agency action, it may not consider evidence outside the administrative record for the purpose of substituting its judgment for that of the agency. But that did not occur here. The district court admitted and used supplementary evidence only to explain the record and to determine the adequacy of the procedures followed and the facts considered by the Secretary in reaching his decision. Some of the testimony considered by the court below was not only proper, but indispensible. For example, the map of the Fort Chaffee area used for KGS determinations by the Tulsa USGS office was not available to the court; if the district court were to review the KGS decision in anything more than a perfunctory, rubber-stamp way it had no choice but to review Johnson's deposition and hear testimony from other current and former USGS personnel to determine the methodology used by that office in reaching its decision. As this Court stated in Independent Meat Packers Association v. Butz, 526 F.2d 228 (8th Cir.1975), cert. denied, 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976):
 
 
 46
 [U]nless an inadequate evidentiary development before the agency can be shown and supplemental information submitted by the agency does not provide an adequate basis for judicial review, the court in conducting the plenary review mandated by Overton Park should limit its inquiry to the administrative record already in existence supplemented, if necessary, by affidavits, depositions, or other proof of an explanatory nature.
 
 
 47
 Id. at 239 (citations omitted, emphasis added).
 
 
 48
 The district court's admission of explanatory evidence served to help the court understand the complex nature of petroleum geology. It also served the related and equally important purpose of educating the court as to the kinds of scientific, technical, and economic data that are relevant to a legally correct KGS determination. Without supplementary evidence of the kind the district court admitted, the court hardly could be expected intelligently to determine whether the Secretary adequately considered all the factors that go into a proper KGS determination. Both plaintiffs and defendants brought in experts to educate the court and to illuminate the administrative record, not to substitute the court's judgment for the Secretary's. We do not find any error in the scope or methodology of the district court's review of the Secretary's decision.
 
 Validity of the KGS Determination
 
 49
 The Secretary and TXO argue that the lands in question were properly classified as non-KGS. But the Department, in making the KGS determination, did not consider pertinent geologic information that readily was available to it or actual competitive interest that had been shown in the Fort Chaffee area. Instead, the Department made its determination under an arbitrary one-mile stepout rule. These actions ignore Congressional intent in enacting the MLA and are inconsistent with that statute. Therefore, because the Department applied an arbitrary mileage rule without even considering geologic information or competitive interest, we hold that the KGS determination is unlawful.
 
 
 50
 The Department's treatment of the lease applications in this case brings to mind the legend of the tribesmen who sold Manhattan Island for a few trinkets and a small quantity of strong drink. In the words of Lorenz Hart,
 
 
 51
 Old Peter Minuit had nothing to lose,
 
 When he bought the Isle of Manhattan
 
 52
 For twenty-six dollars and a bottle of booze
 
 And they threw in the Bronx and Staten.[14]
 
 53
 The analogy is not perfect, however, because the Department in this case probably had far more insight into the value of what it was selling than did the Indians in their transaction with the Dutch. In spite of a wealth of information available to him, Johnson, an experienced geologist with special knowledge of the Fort Chaffee area, was constrained by the admonitions of his superiors to limit any KGS extension to not more than one mile beyond the section in which the well was located. Thus, he was not free to use the full range of his expertise in making KGS determinations. Instead, he used a method for KGS determinations that was specifically rejected by Congress in response to the protests of the oil industry--an arbitrary mileage system.
 
 
 54
 Prior to his cancellation of the leases, the Secretary ordered the USGS to conduct a review of the Tulsa USGS office's KGS determination. The result was the Girard report, which thus far has been the only official administrative review of the KGS determination for the TXO leases. D.R. at 392-433. The covering memorandum to the report from the Director of USGS makes the following statement with regard to USGS policy on KGS determinations in the Fort Chaffee area:
 
 
 55
 The history of the oil and gas industry's desires with regard to KGS's is that the Geological Survey define them in a restricted fashion. Consistently, the industry has challenged the Survey as being too liberal in its interpretations, and consistently the courts have supported the existing interpretation. Therefore, in the Fort Chaffee case, the Survey has found itself in a difficult situation. Any layman reviewing production in and around Fort Chaffee would conclude that the Fort Chaffee area is potentially productive. However, for our personnel to have defined the KGS's in any way other than the determination which was made, would have put the Survey and the Department in a position that was open to challenge in the courts.
 
 
 56
 Id. at 393-94. This statement helps to explain the "criticism" received by Johnson for attempting to make KGS determinations beyond the one-mile stepout. The USGS feared court challenge, but the fear of being sued is no excuse for a failure to implement Congressional intent. The USGS, which by its own admission never has had a KGS determination reversed for being too broad, had every reason to believe that, if challenged, its proper judgment would be sustained. Instead, it bowed to industry pressure by using an arbitrary mileage standard, which surely never would be challenged as being over-inclusive, since the State of Arkansas used it as a minimum spacing unit for producing wells.
 
 A. Congress and the MLA
 
 57
 The MLA, passed in 1920, forms the basis of the Secretary's authority to lease mineral rights on federal lands. Though the MLA originally applied only to lands in the public domain as part of federal sovereignty, it later was extended to cover virtually all lands owned by the federal government. The broad purpose of the MLA was to provide incentives to explore new, unproven oil and gas areas through noncompetitive leasing, while assuring through competitive bidding adequate compensation to the government for leasing in producing areas.
 
 
 58
 A major controversy in the Congressional hearings arose over where the line should be drawn between competitive and noncompetitive lands. Review of the legislative history of the MLA reveals that several arbitrary mileage rules for identifying lands to be leased competitively were considered but that all were rejected.[15] Oil industry spokespersons protested that these proposals did not comport with the geologic realities of oil fields. They argued that allowing competitive leasing only within known geological structures would truly reflect the way in which oil accumulates underground. Congress accepted that argument and the law as enacted provided that competitive leasing would be the rule for lands lying within "known geological structures of producing oil or gas fields." The legislative history of the Act shows that oil industry spokespersons represented and Congress understood that, for purposes of the MLA, the term KGS, though a broad term, basically meant domes and anticlines which contained producing wells.[16] Given that meaning, a KGS could extend considerably less or considerably more than one mile from a given well, depending on the geology of the area. The legislative history makes it clear that when it enacted the MLA, Congress accepted the factual premise that no arbitrary mileage rule can, other than by sheer chance, define a KGS.
 
 
 59
 Concededly, KGS is a broad term, and the Secretary has authority to determine its meaning. Even so, this authority must operate within the confines of Congressional intent, not to mention common sense. These confines were exceeded when, based on a map nearly void of pertinent information other than one-mile sections around producing wells, the Secretary disposed of valuable public resources at fire sale prices. This was no substitute for the use of proper procedures to determine if the lands to be leased are within a KGS. That an arbitrary mileage rule was used by the Tulsa USGS office as the sole KGS determinant in itself clearly demonstrates that the KGS determination in this case was at odds with the express intent of Congress.
 
 B. Geologic Information
 
 60
 A great deal of geologic information was available to the Tulsa USGS office, including National Gas Policy Act determinations,[17] various relevant technical logs, annual reservoir pressure reports, subsurface structure maps, and cross sections of the Fort Chaffee area. All of this data was kept either at the Tulsa office, the Arkansas Oil and Gas Commission office in Fort Smith, Arkansas or the USGS office in Little Rock. From information at the Tulsa office, it readily could be determined that sixty-one per cent of the drilled sections within or partially within the Fort had commercially producing wells and another twenty-six per cent had shows of gas. There is no indication that any of this information was considered.[18] The map used for the clearlisting decisions contained only well number, production, and depth of producing wells.[19] It contained no information about depths of production, shows of gas, or height above sea level of the wells.[20]
 
 
 61
 The Secretary argues that Johnson was an experienced geologist and that his use of the one-mile rule was a result of his familiarity with the geology of Fort Chaffee acquired during his long tenure with the Tulsa office of the USGS. No one disputes Johnson's expertise as a geologist or his familiarity with the Fort Chaffee area. Johnson applied the one-mile rule in this case not because of geological expertise, but because he previously had received criticism from his superiors for attempting to deviate from the rule. Johnson deposition at 62-63, 197. If in fact Johnson had been allowed free rein to use his knowledge in interpreting all the available data, this case may never have arisen. In any event, for the Department to fix the boundaries of a "known geological structure" without first considering pertinent geologic information that readily was available to it is plainly inconsistent with the MLA. Equally inconsistent is the Secretary's decision to grant the TXO leases based upon such a KGS determination.
 
 C. Competitive Interest
 
 62
 Perhaps even more serious than the Secretary's failure to make use of the available geologic data and expertise is his failure to consider actual competitive interest in the Fort Chaffee area shown by Arkla and other oil companies. Arkla had made numerous inquiries to BLM about obtaining leases on Fort Chaffee. D.R. at 352-70. Prior to the issuance of the leases in question, Arkla had bid on various drainage leases within Fort Chaffee. In one sale, Arkla's bids of $151.51 per acre on two sections within the Fort were rejected as too low. These sections were but one section away from the TXO lease area, 562 F.Supp. at 1219-20, which was leased for only $1 per acre.[21] There also was other information available to USGS giving them notice of the considerable interest in the Fort Chaffee lands. D.R. at 1219-22. In light of this, the use of an arbitrary mileage system ignores the Congressional intent to promote competitive leasing within known geological structures of producing oil and gas fields.
 
 
 63
 Furthermore, while the Girard Report concludes that the KGS determination was correct "in a legal sense," a thorough reading of the report damns that conclusion with faint praise. In a telling passage, the report notes the failure of the Tulsa USGS office to consider exploration interest:
 
 
 64
 [The KGS determination] apparently was made without any consideration of the very unusual circumstances regarding the lands in question. Because the Fort Chaffee Military Reservation has not been available for oil and gas exploration (with the exception of drainage drilling), a normal evolutionary exploration process has not taken place. Through time, the Reservation has become virtually surrounded by producing gas wells. Based on the regional geology, there is a very high probability that many gas discoveries will be made on the lands in question. Noncompetitive leasing was originally designed to stimulate exploration on Federal lands. There was no need to 'stimulate' exploration on the lands in question, because the exploration interest is already there. It would have been more prudent to have called to the attention of higher authority the controversial nature of the lands in question.
 
 
 65
 Id. at 416-17. Thus, the USGS's own study reveals that competitive interest and risk of exploration were not considered in making the Fort Chaffee KGS determinations. Because relative risk of exploration and exploration interest lie at the heart of the competitive/noncompetitive leasing dichotomy in the MLA, the failure of the USGS and the Secretary to consider these factors renders the KGS determination unlawful.
 
 Epilogue
 
 66
 The Department eventually took steps to correct the deficiencies in its KGS determination procedures that the Girard Report and subsequent internal reviews revealed. As evidence of this shift, this Court takes judicial notice of BLM Instruction Memorandum No. 84-35 (October 14, 1983)[22] (IM 84-35) which states:
 
 
 67
 The simple procedure of taking the spacing unit of the producing well and the adjacent spacing units as a KGS is not sufficient. Although this procedure may be a good start, it does not meet the definition of a KGS either under the intent of the Mineral Leasing Act of 1920, nor does it accord with the established practice prior to the last decade.
 
 
 68
 Id. at 1 (emphasis added).
 
 
 69
 IM 84-35 goes on to outline a procedure for KGS determinations strikingly similar to that advocated by Arkla and mandated by the district court. This procedure calls for consideration of shows of gas or oil, acknowledges that stratigraphically controlled accumulations may be very extensive, states that a closed anticline may be assumed to be presumptively productive, and that a structure may be proven with very few wells. Id. at 1-2. IM 84-35 also states that a KGS normally will include at a minimum the nine sections surrounding a producing well. As the record in this case reveals, the Tulsa USGS office only once extended a KGS beyond nine sections. See supra p. 352.
 
 Conclusion
 
 70
 In short, the Department did not do its homework before it classified the Fort Chaffee lands as non-KGS under an arbitrary mileage rule and granted these leases. These actions were taken without consideration of such "relevant factors," see Citizens to Preserve Overton Park v. Volpe, supra, 401 U.S. at 416, 91 S.Ct. at 823, as available geologic data and actual competitive interest. Based on our review of the administrative record as amplified and explained by the proceedings in the district court, we hold that these Secretarial actions were unlawful.
 
 
 71
 The judgment of the district court is affirmed.
 
 
 72
 JOHN R. GIBSON, Circuit Judge, dissenting.
 
 
 73
 The court's opinion today has much appeal. It affirms the necessity for competitive bidding for the oil leases in question and will result in substantial income for Arkansas schools. See 30 U.S.C. Secs. 191, 355. The court, however, paints with too broad a brush, substantially exceeding our proper narrow scope of review, and I must respectfully dissent.
 
 
 74
 I find it hard to conclude that the district court did anything other than conduct a de novo hearing and substitute its judgment for that of the Secretary. The hearing extended over four days; ten witnesses testified in person and three by deposition. The hearing transcript totaled 837 pages and the deposition testimony totaled 338 pages. The district court in its order made some eighty findings of fact dealing with the geologic issues. See Arkla Exploration Co. v. Watt, 562 F.Supp. 1214, 1218-24 (W.D.Ark.1983) (Findings of Fact 37-113, 119-22). There was testimony and findings of expert opinions contesting the method upon which Johnson clearlisted the leases as being non-KGS.
 
 
 75
 While the district court finds that there was no rational basis underlying the application of the one-mile rule, its findings of fact ignored the testimony showing that such a rational basis existed. Johnson testified that production in the area was trapped by stratigraphic lenses. Johnson deposition at 20. The area was characterized by usually very small but numerous gas traps. Id. at 180-81, 191. Such a geological structure explains the usage of the one-section measure, which is consistent with that adopted by the State of Arkansas. The witness Horton further explained that Johnson's knowledge of the small size of the traps in the area formed the basis for stepping out KGS's on sections in the area. Tr. at 682-84, 745, 746.
 
 
 76
 The testimony was clear that Johnson had long experience and detailed geological knowledge of the area in question. The court overlooks testimony that this knowledge was utilized in making the conclusion that the one-mile stepout in this particular area was desirable. Nor does the record reflect that Johnson's policy of stepping out one section was totally automatic. If the well was not a good one or had a thin sand, it might be included in the adjacent section. Johnson deposition at 62. If the well had a particular kind of sand or was expected to have high production, it could be expanded to take in all adjacent sections. It would be a judgment call. Id. at 195-96.
 
 
 77
 While the court dismisses the Girard report as damning the determination with faint praise, the report gives further support for the determination. In his letter that accompanied the report from the USGS Director, the Secretary stated "[i]t is my conclusion that the KGS determinations are appropriate, given our understanding of the geology and the legal definitions that have been operative in making such determinations." D.R. at 392. The report itself states:
 
 
 78
 [T]he geological evidence does not indicate that the oil and gas producing zones in Fort Chaffee are primarily structurally controlled, rather the evidence supports the view that oil and gas production is predominantly stratigraphically controlled and that individual reservoirs do not have broad areal extent.
 
 
 79
 Id. at 393. It further concludes that "[e]xcept as noted above, none of the spacing units (sections) can be tied to a producing well. Therefore, the negative KGS determination was properly made." Id. at 416.
 
 
 80
 All of the foregoing testimony demonstrates that there was a rational basis for the use of the one-mile stepout from each of the posted wells. With such a rational basis, this court should not conclude that the determination was arbitrary and capricious.
 
 
 81
 The court bases its decision on the failure of the Johnson method to meet the statutory requirement, looking essentially to the legislative history. This history demonstrated, however, that when Congress was considering this statute in 1918 the question was whether an arbitrary distance measure of ten or twenty or fifty miles should be used, or the more general geological description. To say that the rejection by Congress of the ten-mile or longer distance measures makes the present determination contrary to this statute is again to overlook the geological testimony of the small gas traps in this particular area that made the use of the one-mile stepout particularly appropriate.
 
 
 82
 The opinion of the court today should be compared with First National Bank of Fayetteville v. Smith, 508 F.2d 1371 (8th Cir.1974). There we recognized that more than mere error is necessary to meet the test and that administrative action may be regarded as arbitrary and capricious only where it is not supportable on any rational basis. Id. at 1376. Further, evidentiary conflicts should be weighed in favor of the administrative action. Id. at 1378. In First National Bank the district court independently weighed the evidence and decided to give greater weight to the testimony of the protestant's expert and focused exclusively on the testimony most favorable to that view rather than the evidence that would support the finding of the agency. The opinion of the court today in affirming the district court takes the same approach as that taken by the district court and properly reversed in First National Bank.
 
 
 83
 A further word is appropriate. The statute does no more than require a determination of known geological structures. The district court in its order, which the court today affirms, establishes a lengthy and detailed procedure of items to be considered in making this determination. See Arkla Exploration Co. v. Watt, 562 F.Supp. at 1227. To approve these requirements means that the court is imposing substantial restrictions on the work of the Secretary. The record indicates that some 17,000 to 18,000 leases per year are submitted for approval. To require the consideration of the factors required by the district court would bring to a standstill any meaningful activity in this area.
 
 
 84
 While the court may feel that a poor job was done in the processing of these leases and that Johnson could have been more thorough, our task is simply to determine whether the actions of the Secretary, acting through Johnson, were arbitrary or capricious. If there is a rational basis for the actions, we do not set them aside. The rational basis exists. I would reverse the judgment of the district court.
 
 
 
 *
 The Honorable H. Franklin Waters, Chief Judge, presiding
 
 
 [1]
 The protest was dismissed as moot on January 3, 1980
 
 
 [2]
 For a discussion of the disposition of this suit see infra note 3
 
 
 [3]
 Arkla's suit to cancel the leases, Arkla Exploration Co. v. Andrus, was held in abeyance pending the outcome of Texas Oil & Gas Corp. v. Andrus. After the decision in Texas Oil & Gas Corp. v. Andrus, the parties to Arkla Exploration Co. v. Andrus filed a joint stipulation subject to court approval that further proceedings in their action be stayed pending final appellate review in Texas Oil & Gas Corp. v. Andrus. Rather than approving the stipulation, the D.C. District Court ordered that the case be dismissed "without prejudice and with all rights preserved to each party." Arkla Exploration Co. v. Andrus, Civ. No. 79-2501 (D.D.C. Oct. 10, 1980) (order dismissing case). The court felt this was appropriate considering the uncertainty of the timing of appellate review. Id
 
 
 [4]
 The D.C. Circuit decided the case on June 11, 1982. It was not until July 20, 1982 that the opinion and judgment of the D.C. Circuit, serving as its mandate, were transmitted to the D.C. District Court
 
 
 [5]
 Arkansas's intervention was prompted by a 1981 Congressional enactment which entitles a state to 50 per cent of the revenues from sales, bonuses, royalties, and rentals of public lands within the state's borders. See 30 U.S.C. Secs. 191, 355
 
 
 [6]
 Federal Coal Leasing Act Amendments of 1975, Pub.L. No. 94-377, 90 Stat. 1083 (1976) (codified at 30 U.S.C. Sec. 181)
 
 
 [7]
 An anticline is a fold in the earth with sides sloping down from a common crest. It appears on the surface, if at all, as a hill, but it does not necessarily appear on the surface. A syncline is an inverted anticline, i.e., sides sloping downward into a valley, meeting at the bottom of a curve or fold in the earth
 
 
 [8]
 The Arkansas Oil and Gas Commission uses a one-section spacing unit to separate oil and gas wells so as to prevent a field from being drained at too rapid a rate. The Director of the Commission testified that this one-section rule is only a starting point and that after a well is established as a producer, a hearing is conducted to determine the actual spacing unit for each new well. Tr. at 66-67
 The one-section stepout used by the Tulsa USGS office employed the basic section township and range platting of the State of Arkansas. Thus, assuming that the maximum stepout was used, a KGS extension for a given well might appear as depicted below.
 
 
 [9]
 Under 30 U.S.C. Sec. 191, a state is entitled to 50 per cent of revenues derived from the lease of public lands located within its borders. Mineral leases are granted noncompetitively if the relevant land is not within a KGS, while land that is within a KGS must be leased competitively. The district court recognized the significance of this with respect to the State of Arkansas:
 Clearly, if the Fort Chaffee tracts are irrationally classified as non-KGS areas, the State will lose one-half of all the money which would have been received from the rental of these lands, which, instead, will accrue to the benefit of whichever oil corporation is involved. Conversely, if the tracts are KGS lands, the State of Arkansas stands to gain tens of millions of dollars from a correct and adequate classification procedure in accordance with law.
 
 
 [548]
 F.Supp. at 472
 
 
 [10]
 Arkla seeks no relief against TXO. TXO was joined as a defendant only because Arkla believed that TXO might claim an interest in the leases or lands that are the subject of this action. In its pleading, Arkla states its uncertainty that TXO is even a necessary party. See D.R. at 78
 
 
 [11]
 TXO does cite one case holding that the Secretary's KGS determination is unreviewable. Wann v. Ickes, 92 F.2d 215 (D.C.Cir.1937). That case, however, has been overtaken by events and does not represent the current law. (1) Wann was decided before passage of the APA and before the Supreme Court's decision in Abbott Laboratories, both of which considerably clarified and expanded the scope of judicial review; (2) Wann was decided under an amendment to the MLA which is no longer in effect. At that time the Secretary was required to lease lands competitively if the lands were "known or believed to contain oil or gas deposits"--a more subjective test than the KGS language now in effect. 30 U.S.C. Sec. 226, as amended by Act of August 21, 1935, 49 Stat. 676, amendment repealed by Act of August 8, 1946, 60 Stat. 950
 
 
 [12]
 The third and fourth requirements also are not met as neither Arkla nor the State of Arkansas was a party or in privity with a party to the prior adjudication so as to afford a full and fair opportunity for them to be heard on the issues presented in this case
 
 
 [13]
 Our conclusion is supported by the Supreme Court's recent statement in Nevada v. United States, --- U.S. ---, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983): "[collateral estoppel] can be used only to prevent 'relitigation of issues actually litigated' in a prior lawsuit." Id. at ---, 103 S.Ct. at 2918, 77 L.Ed.2d at 524 n. 11 (citation omitted)
 
 
 [14]
 "Give it Back to the Indians," from the musical "Too Many Girls," words by Lorenz Hart, music by Richard Rodgers (Chappell & Co. 1939)
 
 
 [15]
 See H.R.14094, reprinted in Hearing before the House Committee on Public Lands, 63rd Cong., 2d Sess. at pp. 3-4 (1914) (50 miles); H.R.3232, reprinted in Hearings before the House Committee on Public Lands, 65th Cong., 2d Sess. at 8 (1918) (10 miles); 56 Cong.Rec. 657 (Jan. 7, 1918) (statement of Senator Kendrick) (20 miles)
 
 
 [16]
 See, e.g., 56 Cong.Rec. 657 (Jan. 7, 1918); Hearings before the House Committee on Public Lands on H.R.3232 and S.2812, 65th Cong., 2d Sess. at 131-32, 238-40, 253 (1918)
 The Secretary now contends that the Department's regulations limit a KGS to known traps or pools of oil or gas, and that each separate trap or zone of production is a separate KGS. 43 C.F.R. Sec. 3100.0-5(a) (1970). This fairly recent redefinition of the term KGS does not comport with Congressional intent that the term KGS be construed as domes and anticlines. Moreover, even the Department does not always follow this new definition. In Nola Grace Ptasynski, 19 I.B.L.A. 125 (March 5, 1975), the Department upheld a USGS determination that all of an area which produced gas from numerous intervals of sand was one KGS, even though each interval was separate. The instant situation is similar to that in Ptasynski. Not less than fourteen different levels of producing sands have been identified in or near Fort Chaffee. Four producing wells have been drilled on the Biswell Hill Anticline, which underlies approximately 50 per cent of the leased area. These wells are located on the lower parts of the anticline. Normally such production indicates production on upper parts of the anticline as well. Tr. at 834-35.
 
 
 [17]
 National Gas Policy Act determinations give the production depth and zone of production of each gas well. Tr. at 82. These determinations are made by the Arkansas Oil and Gas Commission for wells within Arkansas, and are used by the Federal Energy Regulatory Commission in setting the price of natural gas from those wells under the Natural Gas Policy Act. 15 U.S.C. Secs. 3301-15
 
 
 [18]
 I.B.L.A. decisions show that the Department often has made much broader use of available drilling and geologic data than was made here. For instance, although Johnson stated that it was his understanding that the USGS followed a national policy of ignoring shows of gas when making KGS determinations, in Jack J. Bender, 54 I.B.L.A. 375 (May 19, 1981), a KGS extension based on shows of gas was upheld
 
 
 [19]
 The depth of a producing well merely shows the greatest depth to which the well is drilled. Depth of production indicates each level from which that well produces, regardless of whether it is at the maximum depth of the well or at higher levels
 
 
 [20]
 The height above sea level of each well site gives a constant standard against which various wells in a given area can be measured. Such information greatly simplifies the process of correlating data from different wells and levels of production
 
 
 [21]
 In addition, the TXO leases provided for payment of a 12 1/2% royalty on the gross value of any gas actually produced. D.R. at 631-73
 
 
 [22]
 Subsequent to the KGS determination at issue here, the Department of the Interior was reorganized. BLM now has the responsibility for making KGS determinations. IM 84-35 was called to the attention of the Court by the appellees on December 23, 1983, some three months after oral argument. Even though I.M. 84-35 is not part of the record on appeal, the Court is fully empowered to take judicial notice of it as it is an order or rule issued by BLM pursuant to its delegated authority. See New York Indians v. United States, 170 U.S. 1, 32, 18 S.Ct. 531, 539, 42 L.Ed. 927 (1898)